24 N.J. Super. 311 (1953)
94 A.2d 514
CAMPBELL SOUP COMPANY, APPELLANT,
v.
BOARD OF REVIEW, DIVISION OF EMPLOYMENT SECURITY, DEPARTMENT OF LABOR AND INDUSTRY, STATE OF NEW JERSEY AND JOHN A. HATTEL, RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued December 8, 1952.
Decided January 16, 1953.
*312 Before Judges EASTWOOD, GOLDMANN and FRANCIS.
Mr. Grover C. Richman argued the cause for the appellant.
Mr. Clarence F. McGovern argued the cause for the Board of Review, Division of Employment Security, Department of Labor and Industry.
*313 Mr. Abraham Greenberg argued the cause for John A. Hattel et als.
The opinion of the court was delivered by EASTWOOD, S.J.A.D.
The question posed by this appeal of the Campbell Soup Company (hereinafter referred to as the "employer") is whether, having reached the age of 65 years, the employees affected by the retirement provision in the collective bargaining agreement are eligible for benefits under the unemployment compensation statutes.
This appeal is one of several such cases evolving out of the same fundamental factual situation, and which have been consolidated by order of the court.
The employer, with an extensive plant in Camden, New Jersey, is engaged in the business of canning soup and other food products. The claimant, John A. Hattel, was employed by that company from July 21, 1941 until February 28, 1951, as a machine maintenance man. During the term of his employment claimant was a member of Food, Tobacco, Agricultural and Allied Workers Union of America, Local 80, the collective bargaining agent for its members.
On March 22, 1950 an agreement was entered into between the union and the company which provided in part as follows:
"SECTION XII  HEALTH, SAFETY AND WELFARE.

* * * * * * * *
(b) The Company agrees to wholly pay for the pension plan outlined below:
ELIGIBILITY: Employees are eligible after 5 years of service and attainment of age 30 but under age 65.
RETIREMENT AGE: 65 years of age; or earlier with consent of Company, on a reduced amount of pension."
During the month of February 1951 the claimant, John A. Hattel, reached the age of 65 years, and at the end of that month the employer notified him that in view of the provision of the agreement set forth above, he could no longer be employed and thereafter he would receive a pension of approximately $25 per month. The claimant retired and accepted his pension payments.
*314 Thereafter Hattel filed his claim for unemployment compensation benefits and was held eligible by the agency, and the Board of Review of the Division of Employment Security affirmed.
In other cases, referred to collectively as the Attanasio cases, the claimants were found to be production workers, possessing no skill or experience in any line of work other than food processing, wherein the board of review held that these workers had unreasonably restricted their availability for work by seeking employment in similar capacities, and were not entitled to benefits under the statute. The claimants involved in this class also appeal from the board's determination.
A third group of cases, referred to as the Piere cases, involved production workers who had removed from the local labor market and sought employment elsewhere and had thus not restricted their availability. These workers were found to hold compensable claims, from which holding the employer appeals.
The employer contends that the purpose of the unemployment compensation statutes was to provide economic protection to those involuntarily unemployed; that having contracted through the union the employees of the Campbell Soup Company called for a cessation of employment at the age of 65, through the retirement provision of the contract; that the same is not discretionary with the employer and that such separation from employment is, therefore, voluntary on the part of the employee and consequently not compensable under the unemployment compensation statutes; that to be compensatory the cessation of employment must have been "for good cause," which has generally been considered to mean attributable to something beyond the control of the employee; that this is not the situation in the matter sub judice; that it is also a statutory prerequisite to benefits that the claimant be "available for work," and that by acceptance of the pension the employee has not shown an unequivocal exposure to the labor market.
*315 The employer takes the position that the group of employees (in the Attanasio cases) who were unskilled production workers in food processing, found by the board to have non-compensable claims because they had unreasonably restricted their availability for labor, had non-compensable claims for the reason that they voluntarily severed their employment rather than for the reason assigned.
In the last group of cases (Piere cases) the board held that having removed themselves to another area, they had not unreasonably restricted their availability for work and were, therefore, possessed of compensable claims. The employer, however, contends that this holding is too narrow and that this group of cases should be held ineligible for benefits for the reason that they left their employment voluntarily without good cause and made themselves unavailable for work within the meaning of the act.
The employee argues that the board's distinction between semi-skilled and unskilled laborers in determining availability for work was arbitrary; that the employer represents a small percentage of this type of labor in the area and that those workers could be adapted to other industries; that labor confined to this class had not unreasonably restricted itself; that cessation of work at age 65 under the retirement provision was not voluntary, but merely conformed to the company policy formulated many years ago, and that termination of employment thereunder was "with good cause" within the meaning of the statute; that retirement under a pension program does not so restrict a man as to render him unavailable for other employment and thus disqualify him from benefits under the statute; that the claimants in the production workers class had not unreasonably restricted their availability for employment and were available within the meaning and spirit of the statute.
The basic question for determination, and the one to which we direct our primary attention, is whether an employee terminating his employment under a union negotiated contract, providing for his retirement on pension, is unemployed *316 for good cause so as to be possessed of a compensable claim for unemployment compensation under the statute, or whether he has voluntarily terminated his employment and, therefore, is not entitled to unemployment benefits. So far as we can ascertain, this question is one of first impression in our courts.
The statutory enactment to be considered is the Unemployment Compensation Law, R.S. 43:21-1 et seq., which has as its stated purpose or declaration of policy the equalization of and lightening of the burden of economic insecurity resulting from unemployment in the interest of the promotion of the general welfare of society of this State. (R.S. 43:21-2). This principle has been recognized by our courts as paramount. In W.T. Grant Co. v. Board of Review, 129 N.J.L. 402 (Sup. Ct. 1943), it was stated, at p. 405:
"* * * The objective  to protect against involuntary unemployment and the need for that kind of assistance known as `poor relief'; the means  to provide more stable employment and to create a systematic accumulation of funds during periods of employment to provide benefits for periods of unemployment, `thus maintaining purchasing power and limiting the serious social consequences of poor relief assistance.' To give correct interpretation to the provisions of the statute we must carry in mind the dire and distressing situation against which the statute, as a matter of stated public policy, is directed."
American Grocery Co. v. A. & W. Wine, etc., Corp., 131 N.J.L. 383 (Sup. Ct. 1944); Valenti v. Board of Review of U.C.C. of N.J., 4 N.J. 287 (1950); Horsman Dolls, Inc., v. Unemployment, etc., of N.J., 7 N.J. 541, 550 (1951).
The pivotal point about which this controversy revolves is whether the employee's cessation of employment was "voluntary" or "involuntary" under the statute, in light of the provisions of the contract calling for retirement at age 65.
In construing contracts and other written agreements the court must, if possible, ascertain and give effect to the mutual intention of the parties. Fletcher v. Interstate Chemical Co., 94 N.J.L. 332 (Sup. Ct. 1920), affirmed 95 N.J.L. *317 543 (E. & A. 1921); Basic Iron Ore Co. v. Dahlke, 103 N.J.L. 635 (E. & A. 1927); Moses v. Edward H. Ellis, Inc., 4 N.J. 315 (1950); Washington Construction Co., Inc., v. Spinella, 8 N.J. 212 (1951).
There is no contention that the union was not the agent of the individual employees who were members thereof, nor that the contract entered into under date of March 22, 1950 was not the result of the mutual assent of the parties thereto. It is a legal consequence so generally recognized as to require no citation of authority, that the acts of one's authorized agent are considered to be those of his principal and that the principal is bound thereby as if he had participated therein personally. We, therefore, conclude that the provisions of the contract, and in particular the retirement provision under scrutiny, was an expression of assent of the employee.
The language of the retirement provision appears clear and unequivocal; i.e., that at age 65 the employer must pension the employee and he must retire, and under circumstances where the consent of the employer is secured one may retire earlier at a reduced pension. No provision is made for later retirement, and the logical inference would be that retirement was compulsory at 65.
It appears from the record that employees of the Campbell Soup Company have, since the inception of the March 22, 1950 contract, retired without contest by the union, and that the employer subsequently made efforts to change the provision to allow workers to continue in their employment after age 65, but no agreement was reached. The union published a pamphlet dated June 6, 1950, explaining why it had refused to accept the company offer to change the retirement age to allow continued employment until the age of 70, and stated its reasons as follows:
"A. Unemployment is increasing.
B. Younger men and women should have opportunity to find jobs.
C. We should strive for higher pensions, and also for higher social security for employees.
D. We should strive to cut the retirement age down to about 55."
*318 It further appears that in the prior contract between the employer and employee (dated June 13, 1947), the retirement provision contained the language that the retirement age was "normally 65." This language was changed at the instance of the employer in the 1950 work contract, with the approval of the union, to eliminate the indefinite word "normally."
We do not consider the language of the agreement ambiguous and the conduct of the parties thereto, subsequent to its effective date, reveals a mutual understanding as to its meaning and operation. Independent Directory Corp. v. Sherman Industrial, etc., Co., 6 N.J. Super. 32 (App. Div. 1949); Mayer v. Sulzberger, Ibid. 327 (App. Div. 1950); Balsham v. Koffler, 8 N.J. Super. 48 (App. Div. 1950); Washington Construction Co., Inc., v. Spinella, supra.
Considering these matters as a whole, we are of the opinion that subsequent to the execution of the bargaining agreement the union had several opportunities to clarify any doubtful interpretation as to the age at which an employee was to retire; that its efforts were directed at restricting retirement to a maximum age of 65; that there was no discretion open to the employer and that it was compulsory for the employer to retire the employee at that point.
The pertinent provision of the statute concerning eligibility for benefits is R.S. 43:21-4:
"An unemployed individual shall be eligible to receive benefits with respect to any week only if it appears that: * * * (c) He is able to work, is available for work, and has demonstrated that he is actively seeking work, except as provided in subsection (f) of this section; * * *."
R.S. 43:21-5 sets forth the disqualification for benefits and provides in part:
"(a) For the week in which he has left work voluntarily without good cause, and for each week thereafter until he has earned in employment (which may be with an employing unit having in employment one or more individuals) at least four times his weekly benefit rate, as determined in each case."
*319 Considering first the subject of disqualification under the statute, we opine that having called for retirement by the company at age 65, the employees made the matter compulsory as to the company and removed it from the realm of involuntariness as to the employees. Particularly do we find this so in view of the fact that the union refused to permit the company's proposal to raise the retirement age and advocated lowering the age and in addition thereto, assenting to the removal of the indefiniteness of the 1947 contract.
In a similar case, Madison Gas & Electric Co. v. Herbert R. Gardner and the Industrial Commission of Wisconsin (Wis. Circ. Ct., February 6, 1951), the employee was a member of a company inaugurated pension plan which called for retirement at age 65, and just prior to retirement he signed a statement which recited: "I accept retirement." He retired and later made claim for unemployment benefits. The court refused him, stating in part:
"We hold that when an employee voluntarily subscribed to a pension plan under which he is obligated to retire at age 65 * * * then when the retirement age does come, the man is retired by his own volition and cannot claim unemployment benefits upon a theory that he has been discharged.
He reaches for retirement rewards based upon his voluntary leaving of employment and in a contrary breath claims that he was fired and must therefore claim unemployment funds."
Similarly, we feel that the employee may not with justification take a position calling for compulsory retirement at 65 in his contract and then repudiate the binding features thereof upon having attained retirement age in order to claim involuntary unemployment and reap the benefits of unemployment compensation legislation. If the employee was otherwise able, anxious, available and save for the imposition of his own restrictions, he would continue in the employable status. To entitle him to unemployment benefits, the employee may not disclaim his voluntary disqualification therefor. That is a fruit born of his own action, *320 and to hold otherwise would be to alter or amend his contract without justification.
R.S. 43:21-4(c) prescribes a status indispensable to qualification for benefits, i.e., able to work, available for work, and actively seeking work. However, there is a distinction in the statutory view between "eligibility" and "disqualification." Disqualifications from benefits are set forth in R.S. 43:21-5 and section (a) thereunder embodies the element of voluntary cessation of employment. To allow benefits under circumstances where the employee has prescribed the time at which he shall become available for them would do violence to the reason and spirit of a statute enacted to alleviate the misfortunes of unplanned disruptions in employment, of economic misadventures springing from uncontrollable unemployment, and would subvert the policy of equalization of the burden of economic insecurity created by uncontrollable unemployment in favor of those able to manipulate the time at which they make themselves available for the benefits of this social legislation. This we construe to be contrary to the spirit and intent of the enactment.
As stated in Valenti v. Board of Review of U.C.C. of N.J., supra, at pp. 291-292:
"* * * The spirit of a statute gives character and meaning to particular terms. The reason of the law, i.e., the motive which led to the making of it, is one of the most certain means of establishing the true sense. Borough of Edgewater v. Corn Products Refining Co., 136 N.J.L. 664 (E. & A. 1948); City Affairs Committee of Jersey City v. Department of Taxation, 134 N.J.L. 198 (Sup. Ct. 1946); affirmed, Ibid., 614 (E. & A. 1946). It is not `the words of the law, but the internal sense of it that makes the law.' Eyston v. Studd, 2 Plowd. 459 (at p. 465); 75 English Reprint 695. The declared policy is the true key to open the understanding of the statute.
The construction of specific terms must be consistent with the general purpose the law was designed to achieve. The provisions relating to eligibility and disqualification are to be interpreted in the light of the statutory concept of social insurance against the hazards of involuntary unemployment, by compensation to the unemployed for the consequent wage loss. * * *"
*321 Cf. Ford Motor Co. v. N.J. Dept. of Labor & Industry, 5 N.J. 494, 505 (1950).
We have considered the arguments concerning the Attanasio case and the Piere case and the reasons assigned by the board for its decision in each. In the former, much is said of the claimants unreasonably restricting their opportunity for employment by possessing no skill or trade other than processing food in a cannery and as a consequence being unavailable for work and ineligible for benefits. In the latter case it is said that although claimant would have been ineligible for the reasons assigned in the Attanasio case, he had removed to a new labor market and thus made himself available for work and was, therefore, entitled to benefits.
We find nothing in the record to support the holding of the board that the claimants were unable to perform any of the available work in the locale or nearby labor market and on the limited evidence presented on this appeal, it is not sufficient to justify an independent factual determination of this matter. The requirement of availability as prescribed by R.S. 43:21-4(c), has been held to mean that it is satisfied only when the workman is able, willing and ready to accept suitable work which he does not have good cause to refuse. Muraski v. Board of Review of U.C.C., 136 N.J.L. 472 (Sup. Ct. 1948); Valenti v. Board of Review of U.C.C. of N.J., supra. There are no proofs as to these matters.
However, inasmuch as these latter two cases contain the same element as to voluntariness present in the main case of Hattel, the determination in the Hattel case applies equally to these latter cases and makes a determination of the question of availability unnecessary.
The judgment of the board of review is reversed, without costs.