## SIGRID BERGSETH AND ANOTHER v. ZINSMASTER BAKING COMPANY.
## FRANK T. STARKEY, COMMISSIONER OF DEPARTMENT OF EMPLOYMENT SECURITY, RESPONDENT.

89 N. W. (2d) 172.

March 21, 1958—No. 37,310.

*McCabe, Van Evera, Donovan & Mundt* and *William P. Van Evera,* for relator.

*Miles Lord, Attorney General,* and *George C. Gubbins, Jr., Assistant Attorney General,* for respondent commissioner.

DELL, CHIEF JUSTICE.

Certiorari to review the decision of the commissioner of employment

security, the sole question being whether an individual, who is automatically retired from her employment under the terms of a collective-bargaining agreement between her employer and her union, is entitled to receive unemployment benefits.

Claimants, members of Local 21 of the Bakery and Confectionary Workers Union, were employed at relator's baking plant. Pursuant to a union contract a pension plan was inaugurated October 1, 1955, which provided for employer contributions to a pension fund at the rate of two and one-half cents per hour for each employee. Monthly pensions were to be given employees with 15 years or more of service. Severance pay was provided for employees who had worked more than 10 but less than 15 years at the rate of $50 a year for each year commencing with the 11th year. Retirement was required on the first day of the month immediately following an employee's 65th birthday or on October 1, 1956, whichever was later.

The question of whether or not retirement should be automatic and mandatory at 65 was submitted to the union membership at a regular meeting on March 10, 1956, at which time a majority voted in favor of the mandatory provision. Although they were aware of the date and purpose of the meeting, neither of the claimants was present. Each of them knew, however, of the union's decision before the date on which the compulsory-retirement provision became applicable to her.

During the week preceding October 1, 1956, both claimants were informed that their employment would be terminated and that their jobs were being posted. They were further advised to apply for benefits under the pension plan. Both claimants were 67 and had worked for relator for 14 years so that they were not entitled to receive monthly pension payments but each was entitled to $200 severance pay. Both made application for the severance pay which was paid to them and they were separated from their employment. Claimant Coonce also applied for and received social security benefits; at the time of the hearing claimant Bergseth had not yet applied. Both claimants applied for unemployment benefits at the St. Paul office of the Department of Employment Security and their claims were found to be valid. Notice was mailed to relator who objected to the claimants' receipt of the benefits since that would be charged against its experience-rating account.

The claims deputy rejected relator's position and the matter was taken to an appeal tribunal in the department. The tribunal, composed of a chairman and one representative each of the employer and the employees, unanimously found in favor of relator and concluded that claimants were not entitled to unemployment benefits. This decision was appealed to the commissioner of employment security who reversed the appeal tribunal. Relator petitioned this court for a writ of certiorari to review the commissioner's decision, which we granted.

Relator contends that the separation was compulsory under the terms of the collective-bargaining agreement; that the agreement was properly negotiated and ratified; that in compliance therewith claimants left voluntarily and without good cause attributable to the employer; and that, therefore, they are not entitled to unemployment benefits. It is admitted that but for this agreement relator would not have retired these employees. They, on the other hand, claim that they desired to remain on the job; that they were not in accord with the union agreement; that they were forced to retire and thus left involuntarily and with good cause attributable to their employer; and that they are, therefore, entitled to unemployment benefits.

Disqualification from benefits is governed by M. S. A. 268.09. So far as it is here material that section provides:

"An individual shall be disqualified for benefits:

"(1)   If such individual voluntarily and without good cause attributable to the employer discontinued his employment with such employer * * *."

All states have provisions in their unemployment insurance laws to substantially the same effect.[1]

"The voluntary leaving provision disqualifies an individual for benefits upon the concurrence of two factors: (1) the individual must discontinue his employment voluntarily; and (2) such discontinuance of employment must be without good cause attributable to the employer. * * * 'Voluntarily quitting' means the discontinuing of employment

---

[1] 1 CCH, Unemployment Ins. Rep. par. 1975. (Since all references to CCH herein are to the Unemployment Insurance Reporter, it will hereafter be cited only as CCH, preceded by the volume number.)

because the employee no longer desires to remain in the relationship of an employee with the employer from whom he has separated."[2] "Good cause attributable to the employer" embraces situations where employees, through no fault of their own, leave their employment due to factors or circumstances directly connected therewith.[3]

Application of the facts in particular cases to the wording of the statute as construed is complicated by the interpolation of a labor union between the employer and his employees. Our statutes provide that when the majority of the employees in an appropriate collective-bargaining unit select a union to represent them that union is the exclusive bargaining agent for all of the employees in the unit with respect to wages, hours, and other conditions of employment.[4] The right of the individual worker to deal with his employer regarding these matters is surrendered to the bargaining agent. "Thus a worker is bound by the agreement made on his behalf by the bargaining agent to the same extent as though he had entered into it individually,"[5] and the contract is a bar to negotiations with anyone else except a successor union.[6]

When, for one reason or another, an employer is required to dismiss his employee pursuant to the collective-bargaining agreement, questions regarding the voluntary or involuntary nature of the separation arise. By and large, if the contract contains reasonable provisions encompassing appropriate subjects for collective bargaining and is properly negotiated by the authorized agent and properly ratified by the union membership, it will be deemed to be the voluntary act of each individual member of the union, including any dissenters. The ratification forecloses any subsequent claim by an employee that actions which are incumbent upon him under the terms of the contract are involuntary and against his will. Under this rationale, dismissals

---

[2] 5 CCH (Minn.) par. 1975.06.

[3] Fannon v. Federal Cartridge Corp. 219 Minn. 306, 310, 312, 18 N. W. (2d) 249, 251, 252, 158 A. L. R. 389.

[4] M. S. A. 179.16, subd. 1.

[5] Pa. Bd. of Rev. Dec. No. 38359, App. No. B-3-D-238, Feb. 28, 1955, 7 CCH (Pa.) par. 8523.04.

[6] M. S. A. 179.135, subd. 1.

for the following reasons have been held to be voluntary and without good cause attributable to the employer so that unemployment benefits were not available: (1) Refusal to join a labor organization with which the employer had a closed- or union-shop agreement;[7] (2) refusal to pay union dues and thus remain in good standing with the union as required under the contract;[8] (3) refusal to retain union membership

---

[7]Carr v. Saginaw Steering Gear Div. of General Motors Corp. (Mich. Cir. Ct.) Saginaw County, No. 24986, June 20, 1957, 4 CCH (Mich.) par. 8615; Matter of Malaspina, 285 App. Div. 564, 139 N. Y. S. (2d) 521, affirmed, 309 N. Y. 413, 131 N. E. (2d) 709; Lillehaugen v. Central Co-op. Wholesale of Superior, Wis. (Cir. Ct.) Dane County, Dec. 9, 1953, 8 CCH (Wis.) pars. 1975.7672, 8219; Cal. App. Bd. Ben. Dec. No. 5228, Dec. 3, 1948, 2 CCH (Cal.) par. 1975.512; Mass. Bd. of Rev. Dec. Nos. H-1304, Aug. 22, 1950, and H-6555, 4 CCH (Mass.) pars. 1975.021, 1975.895, respectively; Mich. App. Bd. Dec. Dkt. B55-4076-18070, July 3, 1956, 4 CCH (Mich.) par. 1957.771; N. Y. App. Bd. Dec. No. 24,718-50, Mar. 16, 1951, N. Y. CCH, par. 8801.12; Ore. Comm. Dec. Nos. 50-C-124, Oct. 11, 1950, and 56-C-244, Dec. 20, 1956, 6 CCH (Ore.) pars. 1975.019, 8107, respectively; Wash. App. Trib. Dec. No. A-25968, Sept. 13, 1954, affirmed, Comm. Dec. No. 3450, Oct. 27, 1954, 8 CCH (Wash.) par. 1975.235; Wash. Dec. of App. Ex. No. F-451, June 6, 1957, Benefit Series Service Unemployment Ins. Report 91-55, Dec. 1957, catalogued at VL-475.75-43. (Benefit Series Service is a publication of the Social Security Board containing precedent unemployment compensation decisions from the various states. See, 55 Yale L. J. 117 [footnote].)

[8]O'Donnell Unemployment Comp. Case, 173 Pa. Super. 263, 98 A. (2d) 406; Conn. Comm. Dec. No. 102-C-50, Mar. 20, 1950, 2 CCH (Conn.) par. 1975.80; Ind. Rev. Bd. Dec. No. 49-R-47, June 15, 1949, 3 CCH (Ind.) par. 1975.017; Iowa App. Trib. Dec. No. 46A-6079-FJ, June 15, 1946, 3 CCH (Iowa) par. 1975.121; Mass. Bd. of Rev. Dec. No. 6592 Mass. BR, 4 CCH (Mass.) par. 1975.019; Mass. Dec. of Rev. Ex. No. X-39815, May 15, 1947, Unemployment Comp. Interpretation Service, Benefit Series, Vol. 11, No. 4, p. 56 (case No. 12363); N. Y. App. Bd. Dec. No. 11,875-45, May 28, 1945, N. Y. CCH, par. 1975.635; Ohio Bd. of Rev. Dec. No. 613-BR-49, June 23, 1949, 6 CCH (Ohio) par. 1975.55; Ore. Comm. Dec. No. 53-C-4, Feb. 13, 1953, 6 CCH (Ore.) par. 1975.017; Wash. App. Trib. Dec. No. A-15178, June 3, 1949, 8 CCH (Wash.) par. 1975.237; Wis. Comm. Dec. No. 48-C-37 and App. Trib. Dec. No. 49-A-948, 8 CCH (Wis.) pars. 1975.7671, 1975.7675, respectively.

as required under the contract;[9] (4) marriage, after which the contract requires a discharge;[10] (5) pregnancy, at which time the contract requires a discharge;[11] (6) refusal of a transfer or a downgrading which involves a lower pay scale or less favorable hours but permits retention of seniority, as provided for by a contract;[12] (7) refusal to abide by a union-management reinstatement agreement;[13] (8) refusal to pay a fine levied by the union;[14] and (9) refusal to comply with union rules.[15] These separations were without good cause attributable to the employer because they resulted from circumstances about which the employer could do nothing and which were solely within the control of the employee. The separations were voluntary because they resulted from the acts of duly selected bargaining agents. "Their acts were his [the employee's] acts."[16]

---

[9]Minn. App. Trib. Dec. No. 3588-B, Feb. 16, 1942, 5 CCH (Minn.) par. 1975.45; Cal. App. Bd. Ben. Dec. No. 5040, Aug. 31, 1948, 2 CCH (Cal.) par. 1975.514; Mich. App. Bd. Dec. Dkts. B6-1644-3277, May 24, 1946, B5-9178-3149, May 23, 1946, and B5-4890-2611, Dec. 7, 1945, 4 CCH (Mich.) par. 1975.771; Mo. App. Ref. Dec. No. A-41-52, Jan. 28, 1952, 5 CCH (Mo.) par. 8163.13; Pa. Bd. of Rev. Dec. Nos. B-28783, July 28, 1952, and B-25452, Sept. 7, 1951, 7 CCH (Pa.) par. 1975.580.

[10]Means Unemployment Comp. Case, 177 Pa. Super. 410, 110 A. (2d) 886. See, also, Elliott Unemployment Comp. Case, 180 Pa. Super. 542, 119 A. (2d) 650. Cf. Huiet v. Atlanta Gas Light Co. 70 Ga. App. 233, 28 S. E. (2d) 83; M. S. A. 268.09, subd. 1(4).

[11]Rzepski Unemployment Comp. Case, 182 Pa. Super. 16, 124 A. (2d) 651. See, M. S. A. 268.09, subd. 1(2).

[12]Matter of Gerdano, 2 App. Div. (2d) 88, 153 N. Y. S. (2d) 924; Roberts v. Chain Belt Co. 2 Wis. (2d) 399, 86 N. W. (2d) 406; Iowa Comm. Dec. No. 52C-1351, Feb. 29, 1952, 3 CCH (Iowa) par. 1975.549; N. Y. App. Bd. Dec. No. 45,657-54, Oct. 22, 1954, N. Y. CCH, par. 8942.12; Tex. Emp. Comm. App. No. 5559-CA-55, June 1, 1955, 7 CCH (Tex.) par. 8188.

[13]Wis. App. Trib. Dec. No. 38-A-101, affirmed, Comm. Dec. No. 38-C-39, 8 CCH (Wis.) par. 1975.761.

[14]Ill. Bd. of Rev. Dec. No. 42-BRD-575, Dec. 23, 1942, 3 CCH (Ill.) par. 1975.693.

[15]Iowa App. Trib. Dec. No. 46A-5993-FB, June 6, 1946, 3 CCH (Iowa) par. 1975.587.

[16]Ohio Bd. of Rev. Dec. No. 613-BR-49, June 23, 1949, 6 CCH (Ohio) par. 1975.55.

. Cases involving a labor-management contract provision regarding compulsory retirement are rare. We know of only three states which have passed on the matter,[17] and in only one of these has there been a final decision by a court of last resort. The first reported determination was by the Pennsylvania Board of Review in 1951.[18] The board there found that a claimant who was compulsorily retired at 68 under a union-management pension agreement did not leave voluntarily.

The only judicial decisions in cases of this nature were in New Jersey in 1953. The appellate division of the superior court held that the retirement was voluntary and that the claimants were not entitled to unemployment benefits.[19] The court there said (Campbell Soup Co. v. Board of Review, 24 N. J. Super. 311, 319, 94 A. [2d] 514, 518):

"* * * the employee may not with justification take a position calling for compulsory retirement * * * in his contract and then repudiate the binding features thereof upon having attained retirement age in order to claim involuntary unemployment and reap the benefits of unemployment compensation legislation. * * * To entitle him to unemployment benefits, the employee may not disclaim his voluntary disqualification therefor. That is a fruit born of his own action, and to hold otherwise would be to alter or amend his contract without justification."

---

[17]Madison Gas & Elec. Co. v. Gardner (Wis. Cir. Ct.) Dane County, Feb. 6, 1951, 8 CCH (Wis.) pars. 1975.52, 8206, and South Penn Natural Gas Co. v. Board of Review (W. Va. Cir. Ct.) Kanawha County, July 16, 1947, 8 CCH (W. Va.) pars. 1995.09, 8073, cited by counsel, involved employer-employee agreements, not union-management contracts and thus are not strictly in point, although in the former it was held that the employee left voluntarily. Cf. Fleiszig v. Board of Review, 412 Ill. 49, 104 N. E. (2d) 818. The South Penn case was decided solely on the ground that the West Virginia law, providing that an employee could not contract away any benefits, voided the agreement. We do not give a similar provision in our statute (M. S. A. 268.17) the same interpretation. Jackson v. Minneapolis-Honeywell Regulator Co. 234 Minn. 52, 47 N. W. (2d) 449.

[18]Pa. Bd. of Rev. Dec. No. B-26435 (Appeal No. B-44-96-E-919) Sept. 27, 1951, 7 CCH (Pa.) pars. 1975.567, 8405.20.

[19]Campbell Soup Co. v. Board of Review, 24 N. J. Super. 311, 94 A. (2d) 514.

The case was reversed by the Supreme Court of New Jersey,[20] one justice dissenting, on the ground that the employees were separated involuntarily. "They left because they had no alternative but to submit to the employer's retirement policy, however that policy as presently constituted was originated."[21] No weight whatever was given to the fact that their actions were taken because of a collective-bargaining agreement.

The remaining determination was by the Kentucky commissioner of economic security. Following the Campbell Soup case, he held that a claimant was involuntarily separated from his employment and hence entitled to benefits.[22]

Notwithstanding the authority to the contrary, we believe that the union contract in the instant case must be given its full effect. We do not agree with the reasoning of the New Jersey Supreme Court; rather we concur in the views expressed by the appellate division of the superior court of that state since we believe they are based upon sounder logic. "* * * [B]y being a member of the union he [claimant] ratified or joined in any of the decisions of the union and must be bound by them."[23]

Any other result would destroy the principles of collective bargaining and render union-management contracts meaningless. We have already indicated that we would uphold these agreements in Jackson v Minneapolis-Honeywell Regulator Co. 234 Minn. 52, 47 N. W. (2d) 449. There, unemployment benefits were denied to a union member who was not entitled to vacation pay when his employer's plant was closed down pursuant to a contract with his union because of a lack of the necessary length of service. We held that the claimant's unemployment during that period was voluntary in view of the existence of the

[20]Campbell Soup Co. v. Board of Review, 13 N. J. 431, 100 A. (2d) 287.
[21]Campbell Soup Co. v. Board of Review, 13 N. J. 431, 435, 100 A. (2d) 287, 289.
[22]Ky. Comm. Dec. No. 2867, May 21, 1957, 4 CCH (Ky.) pars. 8219.07, 1975.16.
[23]Clement Elec. Co. v. Michigan Unemployment Comp. Comm. (Mich. Cir. Ct.) Ingham County, Nos. 15651 and 15652, March 5, 1951, 4 CCH (Mich.) par. 1975.761.

union contract.[24] The principles enunciated in the Jackson case apply even more forcefully in the instant case. Unemployment compensation is designed as a cushion against the vagaries of sporadic losses of work for employees who are genuinely attached to the labor market and who fully expect to return.[25] Retirement benefits, on the other hand, look to a withdrawal from the labor market and more nearly approximate a reward for past services.[26]

We do not overlook what we said in Nordling v. Ford Motor Co. 231 Minn. 68, 76, 42 N. W. (2d) 576, 581:

"* * * The legislative purpose behind the enactment of our act is to be found in the legislative declaration of public policy, § 268.03. It is a general rule that a liberal construction is usually accorded statutes which are regarded by courts as humanitarian or which are grounded on a humane public policy. * * * Where there are disqualifying provisions, the exceptions should be narrowly construed."

It should be pointed out that the remainder of that paragraph reads as follows:

"* * * But these rules of construction do not mean that we are at liberty to put something into the statute which is not there. Our function, guided by ordinary rules of construction, is to ascertain, if we can, what the legislative intent was and to give effect to it."

Section 268.03 declares it to be the public policy of this state to prevent the spread and lighten the burdens of involuntary unemployment "by encouraging employers to provide more stable employment" and to set aside reserves "to be used for the benefit of persons unemployed through no fault of their own." The language clearly indi-

---

[24]And see Johnson v. LaGrange Shoe Corp. 244 Minn. 354, 368, 70 N. W. (2d) 335, 344, in which even the dissenting opinion recognized that the "very significant statement in the Honeywell case [is] that *'Absent this contract * * * there is no evidence of voluntary unemployment'* * * *." (Italics supplied.)

[25]Swanson v. Minneapolis-Honeywell Regulator Co. 240 Minn. 449, 456, 61 N. W. (2d) 526, 531.

[26]Hooker v. Hoey (S. D. N. Y.) 27 F. Supp. 489, 490, affirmed (2 Cir.) 107 F. (2d) 1016.

cates an intention to protect employees from the extreme fluctuations of business conditions, and we would go further than the legislature intended were we to extend it to cover persons who are merely retiring from the labor market.

Nor does § 268.17, subd. 1, stand in the way of the pension provision of the contract here under consideration. This section provides that any agreement to waive, release, or commute an individual's rights to benefits shall be void and precludes an employer from accepting or requiring such a waiver. The agreement in the instant case, however, does not waive rights to benefits to which employees would otherwise be entitled. Rather, it is an agreement for the voluntary termination of employment and is, therefore, not prohibited.[27]

Representatives of both labor and management negotiated the program. The pension and severance-pay provisions appear to be reasonable;[28] no one has questioned their propriety. It may be that if we had participated in the deliberations we might have favored a plan whereby claimants could have worked until they were eligible for a monthly pension. But we did not participate and it is not our function to rewrite the contract which the parties have written for themselves.

When the provision was finally worked out it was submitted to management and the union membership for approval. Both sides ratified the agreement. The claimants' union voted that the claimants and other employees be required to retire at 65 or on October 1, 1956, whichever was the later date. Had they attended the meeting, claimants might have raised any objections or offered any suggestions which they had regarding the pension program; at least they would have had a voice in the union's determination.[29] Yet they chose not to attend the

[27]Jackson v. Minneapolis-Honeywell Regulator Co. 234 Minn. 52, 47 N. W. (2d) 449.

[28]Severance pay in this instance in reality means a short-term pension. The case is thus to be distinguished from Ackerson v. Western Union Tel. Co. 234 Minn. 271, 48 N. W. (2d) 338, 25 A. L. R. (2d) 1063, in which we allowed claimants to collect their benefits.

[29]Cf. Conn. Comm. Dec. No. 353-E-48, Sept. 16, 1948, Unemployment Comp. Interpretation Service, Benefit Series, Vol. 12, No. 3, p. 25 (case No. 13203).

meeting. They cannot now vitiate the contract by setting up their own inaction as the basis for a claim of involuntary unemployment.

Reversed.

MURPHY, JUSTICE (dissenting).

I cannot agree that an employee, by virtue of his membership in a union which has entered into a pension agreement with his employer, has waived his rights to benefits under the unemployment compensation provisions of M. S. A. c. 268. The provisions of this chapter should be liberally construed so as to further its remedial and beneficent purposes. Nordling v. Ford Motor Co. 231 Minn. 68, 42 N. W. (2d) 576, 28 A. L. R. (2d) 272. The social policies which prompted the enactment of this legislation are set forth in § 268.03.

The majority opinion has adopted the narrower construction as expressed in Campbell Soup Co. v. Board of Review, 24 N. J. Super. 311, 94 A. (2d) 514, which decision was reversed by the Supreme Court of New Jersey in Campbell Soup Co. v. Board of Review, 13 N. J. 431, 100 A. (2d) 287. The lower court had held that an employee could not have both the benefits of pension agreement and unemployment legislation—that the pension agreement disqualified the employee from claiming unemployment benefits. On appeal, the Supreme Court of New Jersey reversed the lower court, holding that an employee does not "voluntarily" discontinue his employment where the decision to discontinue is not his and his alone to make. The issues which involve a construction of corresponding New Jersey unemployment compensation statutes are fully discussed in that case. It is my view that the conclusions reached in that decision are sound and should be adopted by this court.

A pension agreement entered into between an employer and its union should not be considered as a substitute for benefits created by social legislation to which all employees are entitled. It is a contractual obligation which flows from considerations separate and apart from the minimal benefits provided by law.

It is my view that the majority opinion wrongly construes the pension agreement as containing, by implication, a provision which is clearly invalid under the law. It seems to me that this conclusion must neces-

sarily follow from the provisions of § 268.17 which prohibit the waiver or release of rights to benefits under c. 268. This view is not inconsonant with Jackson v. Minneapolis-Honeywell Regulator Co. 234 Minn. 52, 62, 47 N. W. (2d) 449, 454, where the employee's enforced leave was a condition of his employment under an agreement for paid vacations. As that decision points out, "There is an important distinction between an agreement for a leave or vacation shutdown which gives rise to no unemployment compensation benefits and a collusive agreement that unemployment compensation benefits be waived." In the Jackson case, the relation of the employer and employee was not terminated. In the case before us, the termination is final. Here the pension contract determines in effect that the employee is no longer qualified for his employment. The construction by the majority denies to the employee the benefits which have accrued to him under the law over a period of many years of service.

I am of the view that where, as here, retirement is enforced by the provisions of a bilateral contract in which the employer has joined, such retirement is not "voluntary" within the meaning of the statute so as to deprive employee of unemployment compensation.

For the foregoing reasons I respectfully dissent.

### ON APPEAL FROM CLERK'S TAXATION OF COSTS.

On April 18, 1958, the following opinion was filed:

PER CURIAM.

The commissioner of employment security has appealed from the clerk's taxation of costs against him upon the ground that he was acting in his sovereign capacity as respondent in this appeal by seeking to have relator's experience-rating account charged with benefits for the claimants herein and thus increasing the taxes which would thereby become due to the state. If the commissioner had sought to collect revenues to which the state was undoubtedly entitled, there would be no question that he was acting in his sovereign capacity and would be immune from the taxation of costs.[30] However he was seeking not to

---

[30]Northern Nat. Bank v. Northern Minnesota Nat. Bank, 244 Minn. 202, 70 N. W. (2d) 118.

collect revenues which were due and owing but rather to determine whether or not these taxes were to be imposed at all. Therefore the case must be dealt with as one in which a private citizen challenges state action under a statute. We have held that in such situations costs may not be taxed against the state when the other party prevails.[31] These instances are to be distinguished from the cases where the state itself is in court in the same capacity as any private party so that costs may be taxed against it.[32]

The clerk's taxation of costs must be set aside.

---

[31]Mushel v. Schulz, 139 Minn. 234, 166 N. W. 179.

[32]See, Bingenheimer v. Diamond Iron Min. Co. 237 Minn. 332, 54 N. W. (2d) 912.