No. 46,594

SOUTHWESTERN BELL TELEPHONE COMPANY, a Corporation, *Appellant*, v. EMPLOYMENT SECURITY BOARD OF REVIEW OF THE STATE OF KANSAS, and MARIE T. DAILEY, *Appellees*.

(502 P. 2d 645)

Opinion filed November 4, 1972.

*T. Larry Barnes*, of Topeka, argued the cause, and *Lawrence A. Dimmitt*, also of Topeka, was with him on the brief for the appellant.

*Marlin A. White*, of Holton, argued the cause and was on the brief for the appellee.

The opinion of the court was delivered by

OWSLEY, J.: This is an appeal from a decision of the district court affirming an order of the Kansas Employment Security Board of Review finding Marie T. Dailey was entitled to maximum unemployment compensation benefits upon her retirement at age sixty-five. Marie T. Dailey will be referred to as Dailey, Southwestern Bell Telephone Company as Bell, and the Kansas Employment Security Board of Review as the Board.

Broadly stated, the issue is whether one who wishes to continue working is entitled to unemployment benefits after retirement under a mandatory retirement plan which is part of a union-management agreement.

Dailey entered Bell's service in 1938 as a telephone operator. At that time Bell had adopted and was maintaining a "Plan for Employees' Pensions, Disability Benefits and Insurance." The plan called for retirement at age sixty-five, which was known by Dailey. In 1941 an agreement was made between Bell and the Union (Communications Workers of America, AFL-CIO), of which

Dailey was a member, that no change would be made in the "plan" without the consent of the Union.

On February 1, 1969, Dailey, having reached the age of sixty-five, was retired. Her retirement pension amounted to $85.56 per month and on May 31, 1969, it was raised to $125.00 per month. She is also receiving social security payments in the sum of $146.00 per month. Her salary prior to retirement had been $105.50 per week.

On February 28, 1969, Dailey filed an application for unemployment benefits. On March 3, 1969, an examiner found she was disqualified. On appeal, a referee reversed the decision of the examiner. On review by the Board, it was found that Dailey was entitled to unemployment benefits. The decision of the district court was in accord with the Board and Bell has appealed to this court.

The jurisdiction of this court on review of the action of an administrative body is not in question. The parties agree that the issue hereinbefore stated is a question of law and as such is subject to judicial review under K. S. A. 1971 Supp. 44-709 (*i*).

A large portion of the monies used for administration of the unemployment benefit laws comes from taxes on employers. The method of assessing and collecting these taxes is set out in K. S. A. 1971 Supp. 44-710, et seq., which establishes an employer's "experience rating." The experience rating is determined by the number of times ex-employees obtain benefits without periods of disqualification. If there is no period of disqualification the employer's account is charged with the full amount which the claimant receives. If the claimant is disqualified for any statutory reason he is disqualified "For the week in which he left work . . . and for the six (6) consecutive weeks which immediately follow such week: . . ." (K. S. A. 1971 Supp. 44-706 [*a*].) After the seven-week period has passed, the claimant is then permitted to receive unemployment compensation if he still meets the eligibility requirements. Payments are not charged to the experience rating of the employer when claimant leaves his employment voluntarily without good cause. (K. S. A. 1971 Supp. 44-710 [*c*].) The result is that the employee who voluntarily left the labor market through no fault of the employer may be allowed a limited amount of compensation, but the employer will not be taxed for these payments.

Eligibility conditions are found in K. S. A. 44-705 (now K. S. A. 1971 Supp. 44-705), which sets forth five requirements. Eligibility is frequently questioned under requirement (*c*) which provides claim-

ant "is able to work, is available for work, and is making reasonable efforts to obtain work." Bell does not question Dailey's eligibility under this statute.

Disqualifications for benefits are found in K. S. A. 44-706 (now K. S. A. 1971 Supp. 44-706.) When a disqualification rule applies, a claimant may still be eligible to receive benefits, but not for the full twenty-six weeks. This case involves Dailey's disqualification. The pertinent part of the statute reads:

"An individual shall be disqualified for benefits:

"(a) For the week in which he left work voluntarily without good cause and for the six (6) consecutive weeks which immediately follow such week: *Provided,* That if an individual leaves work by his own action because of domestic or family responsibilities, not including pregnancy, self-employment or to retire because of disability or old age, or to attend school such individual shall be disqualified for benefits until he again becomes employed and has had earnings of at least eight (8) times his weekly benefit amount."

The issue presented in this appeal is one of first impression in this state. It might be advisable, however, to review our unemployment benefit cases to the extent they might bear on the issue in this case.

In *Clark v. Board of Review Employment Security Division,* 187 Kan. 695, 359 P. 2d 856, the claimant, having reached mandatory retirement age, was retired on a pension from his employer, Skelly Oil Company. The case was decided against the claimant on the eligibility issue of availability for work. We did not consider the effect of the mandatory retirement. We did state, however, that the public policy of the state is to ". . . protect against *involuntary unemployment*—that is, to provide benefits for those who are unemployed through no fault of their own and who are willing, anxious and ready to support themselves and their families, and who are unemployed because of conditions over which they have no control; . . ." (p. 698.)

In *Goodyear Tire & Rubber Co. v. Employment Security Board of Review,* 205 Kan. 279, 469 P. 2d 263, we considered a vacation shutdown of two weeks and said:

"Under a collective bargaining agreement which authorized the employer to shut down all or part of its plant for two weeks for vacation purposes, and those employees eligible to a vacation were required to take their vacations during the shutdown period, unless they elected to defer all or part of their vacation to the following year, or had scheduled their vacation for some other time during the vacation year, in which case they were considered on a 'leave of absence,' it is *held,* that employees who elected to take their vacations at some other time than during the shutdown period were *voluntarily unemployed*

and, thus, were not eligible for unemployment compensation benefits under the law." (Syl. ¶ 2.)

This was a four-three decision. The dissent was principally based on K. S. A. 44-718, which provides "No agreement by an individual to waive, release, or commute his rights to benefits or any other rights under this act shall be valid. . . ." It was said:

". . . The holding of the majority now makes an employee's eligibility for benefits dependent upon the niceties of expression found in each collective bargaining agreement and disregards the conditions of eligibility specifically enumerated in the act. Actually, the court's interpretation of the agreement in question amounts to a waiver of rights to which an employee is otherwise entitled. Such agreements are invalid under the provisions of the act." (p. 291.)

In *Pickman v. Weltmer,* 191 Kan. 543, 382 P. 2d 298, we said the provisions of the Kansas Employment Security Law should receive a liberal interpretation.

In *Southwestern Bell Telephone Co. v. Employment Security Board of Review,* 189 Kan. 600, 371 P. 2d 134, we held that lump sum payments on termination of employment pursuant to a collective bargaining agreement did not render employees ineligible for unemployment compensation benefits. We also stated that need of the claimant was not a prerequisite to eligibility.

Our approach to the issue is set by the rule of liberal interpretation. (*Pickman v. Weltmer,* supra.) The public policy of the state is to "protect against involuntary unemployment." (*Clark v. Board of Review Employment Security Division,* supra.) Lump sum payments on termination of employment pursuant to a collective bargaining agreement do not render an employee ineligible and need of an employee is not a prerequisite to eligibility. (*Southwestern Bell Telephone Co. v. Employment Security Board of Review,* supra.) The effect of *Goodyear* will be later discussed.

Turning to other case law, we find the first mandatory retirement case to reach the appellate courts was *Campbell Soup Co. v. Div. of Employment Security.,* 13 N. J. 431, 100 A. 2d 287 (1953). The opinion was written by Mr. Justice William J. Brennan, Jr., now of the Supreme Court of the United States. This case squarely presented the question of whether workers who were required to retire on pension at age sixty-five by a collective bargaining agreement left work voluntarily without good cause so as to be disqualified for unemployment compensation. The court held the workers had left their employment involuntarily and were awarded benefits.

The court considered the use of the word "voluntary", considered the controlling effect of a union contract as to the individual, and considered the effect of a statute similar to our K. S. A. 44-718. The court said:

". . . The act therefore visits no penalty upon the worker who voluntarily quits suitable work if he has good cause for leaving, and only the limited penalty imposed by subsection 5 ($a$) if he leaves without good cause. The Legislature plainly intended that the reach of the subsection was to be limited to separations where the decision whether to go or to stay lay at the time with the worker alone and, even then, to bar him only if he left his work without good cause. The claimants here did not choose of their own volition to leave the employ of Campbell Soup Company when they were separated. They left because they had no alternative but to submit to the employer's retirement policy, however that policy as presently constituted was originated. Their leaving in compliance with the policy was therefore involuntary for the purposes of the statute.

"The fact, given controlling effect by the Appellate Division, that the claimants through their agent, the union, voluntarily subscribed to the contract is made unimportant by this interpretation of subsection 5 ($a$), manifestly required in order to limit its operation within the apparent intention of the Legislature, having in mind, also that the act is to be liberally construed to further its remedial and beneficent purposes. . . .

. . . . . . . . . . . . .

"This design to protect and serve the common interest is also evident in R. S. 43:21-15, providing that 'Any agreement by an individual to waive, release, or commute his rights to benefits or any other rights under this chapter shall be void.' While the treating as voluntary of a worker's leaving at the appointed time pursuant to the contract may not bring the contract within section 15, yet in practical effect the contract operates as an advance surrender of benefits, and an interpretation of subsection 5 ($a$) to embrace such leaving is clearly inconsistent with the attainment of the statutory objectives. If an understanding as to the duration of employment were to have that effect, countless claimants would be disqualified for benefits. Applicants for work very frequently must take jobs which the employers tell them at the time will engage their services for only a stipulated period. It would not be suggested that voluntary acceptance of such work, knowing in advance its fixed duration, constitutes the leaving of it at the agreed time a voluntary leaving for the purposes of subsection 5 ($a$). The agreement by which the claimants were to leave the employ of Campbell Soup Company at age 65 is equally ineffective for that purpose." (pp. 435, 436, 437.)

The decision in *Campbell Soup* did not remain unchallenged. Five years later in *Bergseth v. Zinsmaster Baking Co.*, 252 Minn. 63, 89 N. W. 2d 172 (1958), the court held claimants were disqualified for voluntarily leaving their employment under facts similar to those in *Campbell Soup*. The court emphasized the

fact that the question of whether retirement should be mandatory or optional at age sixty-five had been submitted to the union membership at a regular meeting and a majority had voted in favor of the mandatory provision. The claimants contended they were not in accord with the union contract and that they desired to remain on the job, and were forced to retire against their wishes. The claimants had not worked for the employer long enough to be entitled to pension payments, but each received $200.00 severance pay. The employer took the position that the claimants' retirement was voluntary, stating he would not have retired them had he not been required to do so by the union contract. The court said:

". . . By and large, if the contract contains reasonable provisions encompassing appropriate subjects for collective bargaining and is properly negotiated by the authorized agent and properly ratified by the union membership, it will be deemed to be the voluntary act of each individual member of the union, including any dissenters. . . .

"Any other result would destroy the principles of collective bargaining and render union-management contracts meaningless. We have already indicated that we would uphold these agreements in Jackson v. Minneapolis-Honeywell Regulator Co. 234 Minn. 52, 47 N. W. (2d) 449. There, unemployment benefits were denied to a union member who was not entitled to vacation pay when his employer's plant was closed down pursuant to a contract with his union because of a lack of the necessary length of service. We held that the claimant's unemployment during that period was voluntary in view of the existence of the union contract. The principles enunciated in the Jackson case apply even more forcefully in the instant case. Unemployment compensation is designed as a cushion against the vagaries of sporadic losses of work for employees who are genuinely attached to the labor market and who fully expect to return. Retirement benefits, on the other hand, look to a withdrawal from the labor market and more nearly approximate a reward for past services." (pp. 66, 70, 71.)

In disposing of the effect of a Minnesota statute similar to our K. S. A. 44-718, the court said:

"Nor does § 268.17, subd. 1, stand in the way of the pension provision of the contract here under consideration. This section provides that any agreement to waive, release, or commute an individual's rights to benefits shall be void and precludes an employer from accepting or requiring such a waiver. The agreement in the instant case, however, does not waive rights to benefits to which employees would otherwise be entitled. Rather, it is an agreement for the voluntary termination of employment and is, therefore, not prohibited." (p. 72.)

The dissent of Mr. Justice Murphy in this case calls attention to the opposing views as to the meaning of this statute. He said:

"It is my view that the majority opinion wrongly construes the pension agreement as containing, by implication, a provision which is clearly invalid under the law. It seems to me that this conclusion must necessarily follow from the provisions of § 268.17 which prohibit the waiver or release of rights to benefits under c. 268. This view is not inconsonant with Jackson v. Minneapolis-Honeywell Regulator Co. 234 Minn. 52, 62, 47 N. W. (2d) 449, 454, where the employee's enforced leave was a condition of his employment under an agreement for paid vacations. As that decision points out, 'There is an important distinction between an agreement for a leave or vacation shutdown which gives rise to no unemployment compensation benefits and a collusive agreement that unemployment compensation benefits be waived.' In the Jackson case, the relation of the employer and employee was not terminated. In the case before us, the termination is final. Here the pension contract determines in effect that the employee is no longer qualified for his employment. The construction by the majority denies to the employee the benefits which have accrued to him under the law over a period of many years of service." (pp. 73, 74.)

The *Campbell Soup* case and the *Bergseth* case created a foundation for a controversy that has continued to rage to the present time. Each of these views has found support among the cases which followed.

The principal cases holding for the granting of benefits under similar facts as in *Campbell Soup* are: *Reynolds Metal Company v. Thorne*, 41 Ala. App. 331, 133 So. 2d 709 (1961), cert. den. 272 Ala. 709, 133 So. 2d 713; *Employment Security Com'n v. Magma Copper Company*, 90 Ariz. 104, 366 P. 2d 84 (1961); *Jenkins v. Review Board of Indiana Emp. Sec. Div.*, 211 N. E. 2d 42 (Ind. 1965); *Gianfelice Unempl. Compensation Case.*, 396 Pa. 545, 153 A. 2d 906 (1959) (*Warner*); *St. Joe Paper Company v. Gautreaux*, 180 So. 2d 668 (Fla. App. 1965).

The principal cases holding for the denial of benefits as in *Bergseth* are: *Kentucky Unemploy. Ins. Com'n v. Kroehler Mfg. Co.*, 352 S. W. 2d 212 (Ky. 1961); *Lamont v. Director of the Division of Employment Security.*, 337 Mass. 328, 149 N. E. 2d 372 (1958); *Ivy v. Dudley*, 217 N. E. 2d 875 (Ohio 1966).

There are no significant statutory differences which have a material bearing on the reasoning of these cases. It would add little to the body of the law of this state to set out the basis on which these cases differ in their conclusions in view of the decision later made herein. An annotation dealing with this question appears in 90 A. L. R. 2d, pp. 842, 843, where the annotator makes this observation:

"It is suggested that the approach of the Pennsylvania and New Jersey

courts, recognizing that simple principles of agency law are not completely applicable to the relationship between empoyee and union, especially in view of the statutory provisions prohibiting waiver of benefits, is preferable. . . .

". . . As has been pointed out by a number of commentators, the rationale of some of the courts in denying benefits to claimants dismissed without fault on their part, because a collective bargaining agreement called for such dismissal and because the employer was not at fault, shows a primary concern with the effect of the dismissal on the employer's experience rating rather than with the underlying economic and humanitarian purposes for which the unemployment laws were enacted."

We are impressed by the strong support given *Campbell Soup* by writers of articles appearing in law reviews. For the benefit of the scholars who have been stimulated by the legal problem in this case, we list the following: 28 N. Y. U. Law Rev. 1332 (1953); 5 Syracuse L. Rev. 286 (1954); 53 Michigan Law Rev. 849 (1955); 4 U. C. L. A. Law Rev. 438 (1957); 34 Notre Dame Lawyer 466 (1958); 39 Boston University Law Rev. 124 (1959); 64 Dickinson Law Rev. 71 (1959.); 59 Columbia Law Rev. 209 (1959); 49 Calif. Law Rev. 580 (1961); 14 Alabama Law Rev. 470 (1961).

We have tried to place the problem in proper perspective as it comes before this court. We believe the issue in this case is controlled by K. S. A. 44-718. What is a proper construction of this statute prohibiting an agreement to waive, release, or commute rights to benefits? The above quotations from *Campbell Soup* and *Bergseth* disclose the opposing views on the meaning and application of like statutes. In *Gianfelice Unempl. Compensation Case.,* supra, (*Warner*), it was said:

"Moreover, we believe that the labor-management agreement cannot govern our determination in this case for another reason. The Unemployment Compensation Law was enacted to alleviate the hardships attendant upon unemployment . . . It is a remedial statute designed to provide support for workers who are unemployed except for those disqualified by one of the specific provisions of § 402 . . . This provision renders invalid any agreement by an employee to waive or release any of his rights under the act. It is our view that if the labor-management agreement were able to be relied upon to disqualify Gianfelice as a 'voluntary quit' when his separation from work was not in fact voluntary, the agreement would be invalid to such extent.

"These analogous examples illustrate the principle we here apply. Where a statute of the Commonwealth expresses a public policy designed to alleviate a condition of possible distress among the public or a segment thereof and *explicitly proscribes waiver of the benefits of the act,* no private agreement, however valid between the parties, can operate as such a waiver. Here, the provisions of the agreement under which Gianfelice had to retire, while legiti-

mate conditions of employment and binding between Gianfelice and the Warner Company, cannot thwart a clearly-expressed state statute under which Gianfelice is entitled to benefits." (pp. 552, 554.)

The opposing view was expressed in *Kentucky Unemploy. Ins. Com'n v. Kroehler Mfg. Co.*, supra. It was said:

"The Commission has questioned the voluntary agreement to participate in the retirement plan as being in violation of KRS 341.470 (1), prohibiting an agreement to waive, release, or commute any benefits payable under Chapter 341, Unemployment Compensation. Reliance is placed on the Warner case. In addition to what has already been said concerning the voluntariness of the agreement, similar arguments were rejected in the Massachusetts, Minnesota, and Wisconsin cases cited. The agreement was not considered as a waiver by the Minnesota and Wisconsin courts, but was deemed an agreement for the voluntary termination of employment. The agreement here did not constitute a waiver under KRS 341.470 (1)." (p. 215.)

Bell maintains that we have squarely decided this point by our expression in the majority opinion in *Goodyear*, where we said:

"This agreement is not one to waive rights to benefits to which an employee otherwise would be entitled; rather, it is one whereby the employees agreed to a voluntary absence from work if they chose to exercise that right. Such an agreement cannot be interpreted to mean an agreement to waive, release or commute benefits as prohibited by the employment security act. (K. S. A. 44-718; *Jackson v. Minneapolis-Honeywell Regulator Co.*, 234 Minn. 52, 47 N. W. 2d 449.)" (p. 285.)

This raises the question of whether K. S. A. 44-718 should have the same application in retirement cases as in a vacation shutdown case such as *Goodyear*. The Arizona Supreme Court dealt with this problem in *Employment Security Com'n v. Magma Copper Company*, supra. Because it strikes at the heart of the problem in this case we quote at length from this opinion:

"It is readily apparent that the above discussed decisions cannot be reconciled. But we think the better view is expressed in the Campbell Soup and Warner Co. cases which focus upon the volition and intent of the individual workman at the time his employment is terminated. Construing a collective bargaining agreement's retirement provisions so as to deny benefits to one required to retire thereunder but willing and able to work violates at least the spirit if not the language of A. R. S. § 23-784, supra.

"It is argued, however, that the decision of this court in Beaman v. Bench, 75 Ariz. 345, 256 P. 2d 721 (1953) requires denial of benefits in the instant case. In Beaman it was held (as in the Moen and Jackson cases, supra,) that employees who had not worked long enough to earn paid vacations were not entitled to unemployment benefits during a company shutdown for two weeks while other workers took paid vacations. There is language in Beaman to the effect that the shutdown was in effect due to union insistence upon strict compliance with the terms of the contract respecting vacations and that there-

fore the claimants were voluntarily unemployed as if they had asked for the layoff themselves.

"There is a great difference, however, between a two-week layoff for vacations and mandatory retirement which is a permanent severance of the employer-employee relation. Further, a vacation period, paid or otherwise, is commonly regarded as part of an employee's overall compensation. For these reasons we regard neither the result in nor the rationale of Beaman as controlling in this case.

"The Arizona Employment Security Law declares 'economic insecurity due to unemployment . . . [to be] a serious menace to the health, morals and welfare of the people of this state.' A. R. S. § 23-601. One is just as unemployed and necessitous between jobs at 65 (or older) as he is at age 25. And an increasing segment of our labor force is now made up of those, such as claimants here, above the age of 65.

"Of course, the short term benefit provided by unemployment insurance is at best a poor substitute for any comprehensive solution of the problem of the aging worker. But if it helps in any small measure to ease the plight of those forced to change occupations after a lifetime of service the legislative purpose is fulfilled.

"There is no express or implied disqualification in A. R. S. §§ 23-775 to 23-777 for receipt of income from employer pension plans. Nor do we find any public policy which prevents claimants from receiving both the pension income and the temporary unemployment benefits. Indeed, the contrary is indicated. For in 1941 the Employment Security Law was amended to no longer disqualify one who also receives wages in lieu of notice and/or workmen's compensation benefits. And in 1952 the disqualification for receipt of old age benefits under the federal social security law was abolished. If the legislature sees no evil in duplication of benefits by the government we will not manufacture a prohibition against overlapping from private sources.

"Here claimants met all of the tests of eligibility as provided in A. R. S. § 23-771. We hold that their leaving work was involuntary in the statutory sense. It thus follows that the appellee's experience rating account is subject to charges for the benefits due claimants. . . ." (pp. 110, 111.)

In construing different statutes contained in the Unemployment Security Act the legislative intent is determined from a general consideration of the whole act. In determining legislative intent the court may properly look to the purpose to be accomplished, the necessity and effect of the statute. (*Tilley v. Keller Truck & Implement Corp.*, 200 Kan. 641, 438 P. 2d 128.) K. S. A. 44-702 reads in part:

"As a guide to the interpretation and application of this act, the public policy of this state is declared to be as follows: Economic insecurity, due to unemployment, is a serious menace to health, morals, and welfare of the people of this state. Involuntary unemployment is therefore a subject of general interest and concern which requires appropriate action by the legislature to prevent its spread and to lighten its burden which now so often falls with crushing force upon the unemployed worker and his family. . . ."

For further statements as to the history and purpose of the act, see *Whitehead v. State of Kansas Labor Department*, 203 Kan. 159, 453 P. 2d 11. As stated in K. S. A. 44-702, as well as in *Clark*, the purpose of the act is to prevent involuntary unemployment.

The claimant in this case, on reaching sixty-five years of age, was retired. It is conceded that she was able to work, was available for work, and was making reasonable efforts to obtain work. She became involuntarily unemployed unless Bell's policy adopted by the collective bargaining agreement, made her retirement voluntary. If voluntary, the retirement had to result from an agreement between Bell and Dailey or between Bell and the union of which Dailey was a member.

The statute prohibits an agreement to waive, release, or commute benefits. It also states such an agreement is void. These words require no dictionary search for their meaning. The difficulty arises when some courts attempt to rationalize these words in order to prevent a workman from collecting a pension as well as unemployment benefits. Even if we concede that the collection of funds from two sources is not desirable, we cannot place a strained construction on the statute in order to accomplish this end. We said in *In re Estate of Pyke*, 199 Kan. 1, 427 P. 2d 67:

". . . [R]unning through all of our cases are the positive statements that the public policy of this state is founded in the Constitution and the statutory enactments, and that this court is not warranted in reading into the plain statutory provisions an exception which those statutes themselves in no way suggest, or in holding they mean something else merely because the result under the particular circumstances leaves something to be desired." (p. 14.)

It is our view that a collective bargaining agreement or any other agreement is invalid to the extent that its provisions are construed to waive, release, or commute unemployment compensation benefits. We adopt and approve *Campbell Soup, Gianfelice Unempl. Compensation Case (Warner), and Magma Copper* in their application and construction of statutes similar to our K. S. A. 44-718.

Bell's contention that such a conclusion is contrary to *Goodyear* is apparent. Although we disapprove the statement in *Goodyear* as to the application of K. S. A. 44-718, we recognize a distinction between vacation shutdown, which is temporary, and retirement, which is permanent. Under the facts in *Goodyear*, we can see merit in an argument that the employees were not available for work and were not members of the general labor market. We can also see merit in an argument that an employee on vacation status

would not conscientiously seek other full time, permanent employment. While we approve the result in *Goodyear*, we can no longer agree with the basis upon which the court reached that result.

Judgment is affirmed.

SCHROEDER, J., dissents.

FROMME, J., concurring: I agree with the rationale and the decision of the court except in one small particular. My views as to the applicability of K. S. A. 44-718 expressed in *Goodyear* remain unchanged and I cannot now approve the result reached in *Goodyear*. The majority opinion as expressed in *Goodyear* should be disapproved by this court for I see no distinction between a negotiated "vacation shutdown agreement" as in *Goodyear* and a negotiated "permanent retirement agreement" as in the present case so far as the prohibition of K. S. A. 44-718 is concerned. I am authorized to say that Mr. Justice Kaul joins in the foregoing concurrence.