HOWARD J. JACKSON v.
MINNEAPOLIS-HONEYWELL REGULATOR COMPANY.
VICTOR CHRISTGAU, RESPONDENT.[1]

April 20, 1951.

No. 35,364.

*Dorsey, Colman, Barker, Scott & Barber, John W. Windhorst,* and *Horace Hitch,* for relator.

*Douglas Hall* and *Hall, Smith & Hedlund,* for respondent Howard J. Jackson.

*J. A. A. Burnquist,* Attorney General, *K. D. Stalland,* Assistant Attorney General, and *George W. Olson,* for respondent Victor Christgau as director of the Division of Employment and Security.

MAGNEY, JUSTICE.

Certiorari to review a decision of the division of employment and security awarding unemployment benefits.

By stipulation, decisions to be made by a claims deputy and an appeal tribunal were waived. The director of the division of employment and security thereupon withdrew the case from the ap-

[1]Reported in 47 N. W. (2d) 449.

peal tribunal and heard the matter in the first instance as provided by M. S. A. 268.10, subd. 5.

Minneapolis-Honeywell Regulator Company is a large manufacturing concern. It has several thousand employes. Early in February 1950 it posted a notice as follows:

"The factory will close for inventory and vacation at the end of the second shift Friday night, June 23, 1950, and reopen at the start of the third shift Sunday night, July 9, 1950."

The plant was shut down and reopened at the dates specified in the notice. The taking of inventory was a purpose in the shutting down of the plant, but as such activity would take only three working days, the primary purpose of the shutdown was to enable the employes to take their vacations at the same time during the two weeks. Howard J. Jackson, an inspector, had been in the employ of the company since October 1949. Employes who had been with the company for a year were entitled to vacation with pay, pursuant to the provisions of the union contract. Since Jackson had been in its employ less than a year, he was not entitled to vacation pay. Out of the company's 7,050 hourly paid production employes, as of June 23, 1950, about 3,500 were ineligible for vacation pay in 1950 for the same reason as Jackson. Shortly prior to the shutdown, the union requested the company to give such employes work during the shutdown period. It refused this request because of the shortness of the time and because it would have been impossible to operate so as to give such employes work during the shutdown. The union then posted a notice encouraging members not entitled to vacations with pay to file claims for unemployment compensation benefits. The shutdown commenced on June 24. On that day Jackson filed such a claim for unemployment compensation. So did about 1,050 other employes. Three to four hundred of the less-than-a-year employes were given an opportunity to work on inventory during the vacation period shutdown. In 1949, 3,450 out of 3,700 employes covered by the contract received their vacation with pay. Jackson performed no work for anyone else from June 23, 1950, to

July 9, 1950. On July 10, 1950, he returned to work, as he and the company at all times expected he would do.

Jackson was a member of Local 1145, C.I.O., which union had been certified by the National Labor Relations Board as the bargaining agent for all the employes covered by the contract. The contract between the union and the company provided that employes who had been employed by the company for a specified period of time should be entitled to vacations with pay. It also contained the following provision:

"Section 2. The Company shall have the option to establish a vacation shutdown between June 1st and August 30th of the then current year. *All employees* shall take time off equal to the established length of the vacation shutdown, except those employees the Company may require to work during the vacation shutdown." (Italics supplied.)

This provision of the contract uses mandatory language and covers all employes, except those employes the company may require to work during the vacation shutdown. The abnormal number of employes on the payroll less than a year when the vacation period of 1950 arrived made it impractical to close down the plant and at the same time permit them to work during the vacation shutdown. It is true that the union did not negotiate a set vacation period, but it did agree that the company could within certain dates shut down its plant for a two weeks' vacation period for all the employes.

On the facts above set out, the director decided that on June 24, 1950, claimant became unemployed; that on June 24, 1950, he filed a valid claim; that during the period from June 24 through July 9, 1950, he was unemployed, able, and available for work, and eligible to establish and did establish his waiting week from June 24 to midnight June 30, and a compensable week from July 1 to midnight July 7.

Any unemployment compensation benefits paid to employes of the company are charged against its account by the division of

employment and security, and the company finds it to its advantage to remove these charges from its account by making payment of an amount equal thereto to the Minnesota unemployment compensation fund. Nevertheless, this fund is considered a fund derived from taxation. In the recent case of N.L.R.B. v. Gullett Gin Co. Inc. 340 U. S. 361, 364, 71 S. Ct. 337, 340, 95 L. ed. 337, 342, the court made this statement:

"* * * Payments of unemployment compensation were not made to the employees by respondent but by the state out of state funds derived from taxation. True, these taxes were paid by employers, and thus to some extent respondent helped to create the fund. However, the payments to the employees were not made to discharge any liability or obligation of respondent, but to carry out a policy of social betterment for the benefit of the entire state. * * * In re Cassaretakis, 289 N. Y. 119, 126, 44 N. E. 2d 391, 394-395, aff'd sub nom. Standard Dredging Co. v. Murphy, 319 U. S. 306, 63 S. Ct. 1067, 87 L. ed. 1416; Unemployment Compensation Commission v. Collins, 182 Va. 426, 438, 29 S. E. 2d 388, 393."

The nature of the tax is set out in State v. Industrial Tool & Die Works, Inc. 220 Minn. 591, 607, 21 N. W. (2d) 31, 40.

The Minnesota employment and security act, M. S. A. c. 268, provides a measure of security against the hazards of unemployment in our economic life. The preamble of the act, § 268.03, states the public policy and the general purposes of the act as follows:

"As a guide to the interpretation and application of sections 268.03 to 268.24, the public policy of this state is declared to be as follows: Economic insecurity due to unemployment is a serious menace to the health, morals, and welfare of the people of this state. *Involuntary unemployment* is therefore a subject of general interest and concern which requires appropriate action by the legislature to prevent its spread and to lighten its burdens. This can be provided by encouraging employers to provide more stable employment and by the systematic accumulation of funds during periods of employment to provide benefits for periods of unemploy-

ment, thus maintaining purchasing power and limiting the serious social consequences of poor relief assistance. The legislature, therefore, declares that in its considered judgment the public good and the general welfare of the citizens of this state will be promoted by providing, under the police powers of the state for the compulsory setting aside of unemployment reserves to be used for the benefit of persons *unemployed through no fault of their own.*" (Italics supplied.)

It is important to know what is meant by the word "unemployment" as used in the act. Section 268.04, subd. 23, defines it as follows:

"An individual shall be deemed 'unemployed' in any week during which he performs no service and with respect to which no wages are payable to him, or in any week of less than full time work if the wages payable to him with respect to such week are less than his weekly benefit amount."

The meaning of the word "unemployment" must, of course, be considered with reference to its use. Since Jackson did not lose his job because of the vacation shutdown, it cannot be said that he was unemployed under the ordinary meaning given the word. The provision of the act itself as set out above defines the meaning of the word "unemployment" as used in the act and with reference to the act. It states that "An individual shall be *deemed 'unemployed'* " under the facts set out. (Italics supplied.) During the two weeks of the vacation shutdown, Jackson performed no services and received no wages. The wording of the act and the existing facts place him squarely within the class defined by the act during those two weeks. If nothing further appeared, it is evident that he would be entitled to unemployment benefits. He and his family were exposed to a "menace to * * * health, morals and welfare," and there was a loss of the purchasing power which the act seeks to maintain. Thus, to that extent the facts meet all the specifications for qualification for receipt of unemployment compensation benefits. But those specifications indicating qualification for benefits would

also have been met if Jackson had asked for a two-week layoff and the company had granted his request.

.The act was designed to meet only the evils which follow "involuntary unemployment," with benefits to be paid to "persons unemployed through no fault of their own." It was not designed to take care of the same evils which might flow from voluntary unemployment.

This case thus narrows down to the proposition whether Jackson's unemployment during the vacation shutdown was voluntary or involuntary. The question is raised by the provision in the contract between the union, of which Jackson was a member, and the company. Absent this contract, there is no evidence of voluntary unemployment. Jackson claims that one cannot read into the statutory definition of "unemployment" an exception to the effect that a person is not unemployed where, pursuant to a union contract, he has reëmployment rights after a vacation shutdown or after a layoff. He insists that he did not voluntarily discontinue his employment when the vacation shutdown went into effect. The company, on the other hand, contends that because of the union contract, plaintiff's unemployment during the vacation shutdown was voluntary. It insists that the existence of the provision of the union contract relative to the vacation shutdown is the determining factor in the case and that under that provision Jackson, during the vacation period, was voluntarily unemployed.

This is not the first instance where the question here involved has arisen. The earliest case called to our attention is In re Employees of Buffelen Lbr. & Mfg. Co. 32 Wash. (2d) 205, 201 P. (2d) 194. The preamble to the Washington statute indicates a policy with reference to voluntary unemployment substantially the same as our own statute. The facts in the Buffelen case are substantially the same as those of the instant case. The union contract provided for vacation pay to employes who were on the payroll for one year prior to the vacation. It also had this provision (32 Wash. [2d] 207, 201 P. [2d] 196) :

"It is understood that vacations may be given by closing down the entire plant during June, July or August, or a part thereof, or by staggering vacations throughout the year, in accordance with the requirements of operation and shipments. The employer shall give and post thirty (30) days' written notice thereof, in order that each employee may make vacation plans."

Because of lack of sufficient time of employment, some employes, as here, could not qualify for vacation pay and sought unemployment compensation benefits. The sole question presented to the Washington court was the identical question presented to us, namely, whether the benefit claimants were voluntarily or involuntarily unemployed by reason of the shutting down of the employer's place of business at the time it granted its employes a two weeks' vacation. The Washington court said (32 Wash. [2d] 210, 201 P. [2d] 197):

"* * * The claimants were parties, through their union, to the agreement which had to do with vacations. They were bound by the terms of that agreement to the same effect as they were bound by the working agreement. In re Polson Lbr. & Shingle Mills, 19 Wn. (2d) 467, 143 P. (2d) 316.

"It is clear that claimants must be held to the liabilities imposed by the contract, and must suffer the result of any provisions in the agreement which is to their detriment. The contract relating to vacations determined which employees were to be paid during vacation periods. The claimants cannot complain that they were not mentioned or their rights ascertained, the reason being that their union spoke for them to the same extent and to the same effect as they could as individuals."

The court then held that the employer was legally acting within the provisions of the vacation agreement; that its employes were unemployed by their own election; that, in effect, the employes secured a leave of absence for the period of time the mill was shut down; and that claimants therefore were not entitled to unemploy-

ment compensation. Mr. Justice Schwellenbach in a concurring opinion said (32 Wash. [2d] 211, 201 P. [2d] 198) :

"* * * They [the claimants] were unemployed during the weeks in question because they performed no services and with respect to which no remuneration was payable to them. The plant was closed down as a result of the agreement made with the company by all of the employees, including these claimants. Their unemployment during that period, therefore, was voluntary, and they are not entitled to unemployment compensation."

In Moen v. Director of Division of Employment Security, 324 Mass. 246, 85 N. E. (2d) 779, 8 A. L. R. (2d) 429 (decided April 26, 1949), we have the same facts as in the instant case. The court held that by the terms of the collective bargaining agreement claimant's unemployment for the vacation period must be deemed voluntary. The court said (324 Mass. 248, 85 N. E. [2d] 781) :

"It is plain that the claimant's unemployment occurred as the result of a collective bargaining agreement between the company and a union of which the claimant was a member and which was the exclusive bargaining agency for those in the company's employ. * * *

"* * * The claimant speaking through the union had agreed that the plant might be shut down in order that vacations could be had by the company's employees. It cannot be said that his unemployment for that period was other than voluntary. Unemployment which is voluntary is not compensable under the employment security law."

In Mattey v. Unemployment Compensation Board, 164 Pa. Super. 36, 39, 63 A. (2d) 429, 431, the court said:

"It is true that during the vacation period claimant performed 'no services,' and with respect to which 'no remuneration' was paid or payable to him. * * * However, the relationship of employer and employe was not terminated, and there was no suspension of that relationship. * * * The vacation or the leave of absence which

he enjoyed was by virtue of his agreement. * * * The effect of the agreement is the same as if claimant had himself requested time off for a vacation, or other personal reason, and it had been granted by his employer. Such mutuality does not create a state of unemployment under the statute, which entitles claimant to unemployment compensation benefits. The situation was created by claimant's duly selected bargaining agents; their acts were his acts; to the temporary cessation of work the employer and employe agreed."

To the same effect is Paden City Pottery Co. v. Board of Review (Cir. Ct. 1949) CCH, 7 Unemployment Insurance, W. Va. par. 8090.

M. S. A. 268.08, subd. 3, provides:

"An individual shall not be eligible to receive benefits for any week with respect to which he is receiving, has received, or has filed a claim for remuneration in an amount equal to or in excess of his weekly benefit amount in the form of

"(1) dismissal payment or wages in lieu of notice whether legally required or not; or

"(2) vacation allowance; * * *."

Here, the director was of the opinion that an individual who is laid off during a vacation period without pay is to be considered the same as though he were subjected to any other layoff without remuneration. It is contended that, inferentially, those employes who are not eligible to vacation pay would be entitled to unemployment benefits, and those whose vacation pay would not equal the unemployment compensation benefit would be entitled to receive the difference. This section was undoubtedly inserted in the act to meet the argument that vacation pay was remuneration for services rendered prior to the vacation period and to set at rest such argument. The inference, to have any validity, must be based on the assumption that, except for this provision, all employes unemployed by reason of vacations, whether with or without pay, would be entitled to receive unemployment compensation benefits. In order to permit this claimed inference to control, it is necessary to say that whether the unemployment was voluntary or not is

immaterial. Since the act contemplates, and so states in its preamble, that its purpose is to alleviate undesirable results which follow from involuntary unemployment and not from voluntary unemployment, and, as we have shown that Jackson's unemployment must be considered voluntary in view of the union contract which covered him as well as all other employes of the company, it seems that a mere inference should not be permitted to give an entirely different aspect to the situation.

The director gives § 268.17, subd. 1, as another reason for making his decision. This section reads:

"Any agreement by an individual to waive, release, or *commute his right to benefits or any other rights under sections 268.03 to 268.24 shall be void.* Any agreement by any individual in the employ of any person or concern to pay all or any portion of an employer's contributions, required under these sections from such employer, shall be void. No employer shall directly or indirectly make or require or accept any deduction from wages to finance the employer's contributions required from him, require or accept *any waiver of any right hereunder by any individual in his employ* or in any manner obstruct or impede the filing of claims for benefits. Any employer or officer or agent of any employer who violates any provision of this subdivision shall, for each offense, be guilty of a misdemeanor." (Italics supplied by director.)

The director in his memorandum expresses the opinion that the above statutes appear to bar an employer and his employes from entering into any agreement whereby a claimant's right to benefits under the definition of employment as given in the act would be in any way abrogated or diminished. In other words, his contention is that under the above statutes the provision in the union contract providing for a simultaneous vacation for all employes is void as to those with insufficient tenure to be entitled to vacation pay. The agreement is not one to waive rights to benefits which an employe otherwise would be entitled to, but an agreement for a two weeks' vacation leave or voluntary absence from work. An

agreement between the employer and its employe providing for a two weeks' leave for the individual employe certainly cannot be interpreted to mean an agreement to waive benefits and therefore prohibited. Such an agreement made collectively by the union should not be placed in a different status. There is an important distinction between an agreement for a leave or vacation shutdown which gives rise to no unemployment compensation benefits and a collusive agreement that unemployment compensation benefits be waived.

We have cited decisions from four states upholding the contention of the employer here. All these states have statutes similar to our § 268.17. The West Virginia court specifically rejected the contention that its statute was applicable in connection with vacation agreements.

In neither Moen v. Director of Division of Employment Security, 324 Mass. 246, 85 N. E. (2d) 779, 8 A. L. R. (2d) 429, nor Mattey v. Unemployment Compensation Board, 164 Pa. Super. 36, 63 A. (2d) 429, was any inference drawn such as is suggested by the director. In both Massachusetts and Pennsylvania, substantially the same statutory provision exists.

Jackson admits that the cases cited hold contrary to his contention, and suggests that they should not be followed. As far as we know, they are the only cases dealing with the question here involved. It is our opinion that they disposed of the matter properly, and we see no reason for taking a different course.

For the reasons herein stated, the determination of the director is reversed.

Reversed.