HENRY WATSON, PLAINTIFF-RESPONDENT, v. UNITED STATES RUBBER COMPANY, DEFENDANT-RESPONDENT, AND HUDSON PIECE DYE WORKS AND BOARD OF REVIEW, DIVISION OF EMPLOYMENT SECURITY, NEW JERSEY DEPARTMENT OF LABOR AND INDUSTRY, DEFENDANTS-APPELLANTS.

Argued May 6, 1957—Decided June 24, 1957.

*Mr. Clarence F. McGovern* argued the cause for the appellant Board of Review.

*Mr. Thomas J. Brett* argued the cause for the respondent United States Rubber Company (*Messrs. O'Brien, Brett & O'Brien,* attorneys).

The opinion of the court was delivered by

JACOBS, J.   The Appellate Division reversed a decision of the Board of Review which found that the claimant Henry Watson was eligible for unemployment benefits during a vacation shutdown of the United States Rubber Company's plant.   We granted certification under *R. R.* 1:10–2.

After having been out of work for about 14 weeks Mr. Watson obtained employment at the Passaic plant of the United States Rubber Company.   He began work on June 13, 1955 and became a member of Local 217 of the United Rubber, Cork, Linoleum & Plastic Workers of America, which had a collective bargaining agreement with the Rubber Company. The agreement provided for paid vacations for employees having seniority of one year or more; it did not set forth any specific schedules but did state that the company would give employees "adequate notice of the time when vacations are scheduled."   For many years the company's practice had been to shut down for two weeks during which employees would take their vacations; during that period there would be no production, but maintenance men (supplemented by selected workers who were not entitled to paid vacations) would clean and repair the premises and equipment.   In March 1955 the company had announced that the shutdown period would be from July 11, 1955 to July 24, 1955, inclusive, and when Mr. Watson was employed he was told about it.   He testified that he knew he would not be entitled to vacation pay and that that was the reason for his claiming unemployment benefits.   In response to an inquiry as to whether he would have accepted the employment if he knew that he would not obtain benefits, he simply said, "I ran out of a job."   When the shutdown occurred Mr. Watson found himself wholly without work and pay; he testified that he "went out every day" looking for work "truck driving, laboring; it didn't make no difference," but was

unable to find any. After the shutdown he resumed work at the Passaic plant of the Rubber Company.

The Board of Review found that the claimant "was able to work, available for work and ready to return at any time to his employer or to accept suitable temporary work during the period from July 11 through July 24, 1955." It concluded that he was eligible for benefits during that period, distinguishing *Glover v. Simmons Co.,* 17 *N. J.* 313 (1955), on the ground that here the shutdown was not compelled by the collective bargaining agreement and was "primarily caused by business considerations related to the employer's business." On appeal, the Appellate Division also recognized that the collective bargaining agreement with the Rubber Company did not oblige it "to effectuate an annual over-all plant shutdown for vacations" or "require the company to grant vacations to all employees at the same time." But it declined to differentiate *Glover* or confine it to its own narrow facts, pointing out that a sound and just solution of the problem raised by payless vacations must necessarily rest upon "the construction of the statute, its public policy and objective." We likewise shall not here attempt to differentiate *Glover* or confine it to its own narrow facts; we are satisfied that under the principles embraced by a majority of this Court in *Teichler v. Curliss-Wright Corporation,* 24 *N. J.* 585 (1957), *Glover* cannot stand and must be considered overruled.

Implicit throughout the opinion in *Glover* is the notion that a vacation without pay is not a sufficiently serious or unreasonable economic hazard calling for protective economic devices such as those embodied in the Unemployment Compensation Law. *R. S.* 43:21–1 *et seq.* This notion would hardly find any acceptance amongst workers who may be dependent upon their weekly paychecks for their families' sustenance. In any event, these are matters of social policy which under our democratic form of government are left to the Legislature rather than to the court. Nowhere in our Unemployment Compensation Law is there to be found anything which suggests the exclusion of benefit payments

to the payless worker who is ready, able and willing to work but is unable to obtain it because his employer's plant is shut down for a vacation period. As *Teichler* points out, the declaration of policy in section 2 (after noting *inter alia* that involuntary unemployment is a matter of general concern requiring legislative action), simply states that there must be .the establishment of a fund "for the benefit of persons unemployed after qualifying periods of employment." It is to the later operative sections that we must turn for identification of those who are eligible for benefits because of their unemployment and the lapse of qualifying periods (*R. S.* 43:21–4), those who, though otherwise eligible, are disqualified from receiving benefits (*R. S.* 43:21–5), and those who are "unemployed" within the contemplation of the law (*R. S.* 43:21–19). The facts in the instant matter clearly disclose that Mr. Watson was unemployed within the terms of *R. S.* 43:21–19, was able to work, available for work and actively seeking work within *R. S.* 43:21–4(*c*), and had not disqualified himself by leaving voluntarily without good cause within *R. S.* 43:21–5(*a*). See *Teichler v. Curtiss-Wright Corporation, supra.*

██ The contention is advanced that by virtue of his membership in the union Mr. Watson had "consented" to the shutdown and was therefore "voluntarily unemployed" and ineligible or disqualified under the Compensation Law. But the eligibility and disqualification provisions of that law contain nothing which would suggest that advance consent to a later shutdown is a ground of ineligibility or disqualification, and their only reference to voluntary unemployment is in *R. S.* 43:21–5(*a*) which disqualifies an individual from receiving benefits for the week "in which he has left work voluntarily without good cause" and for ensuing weeks as there provided. The quoted language patently has no application here. See *Campbell Soup Co. v. Board of Review, Div. of Employment Security,* 13 *N. J.* 431 (1953) ; *Teichler v. Curtiss-Wright Corporation, supra.* Mr. Watson's unemployment during the shutdown could hardly be said to have been voluntary, for he had no mean-

ingful freedom of choice; he could not have rejected the tendered employment with the Rubber Company without rendering himself ineligible or disqualified for having refused suitable work, and when the shutdown did occur he was given no alternative but to accept his layoff or "vacation" without pay. See *Campbell Soup Co. v. Board of Review, Div. of Employment Security, supra.* Under the clear policy expressed in *R. S.* 43:21–15 his acceptance of employment with knowledge of the prospective layoff or "vacation" without pay could in no event be viewed as a lawful waiver of his right to unemployment benefits under the law. See *Glover v. Simmons Co.,* 31 *N. J. Super.* 308 (*App. Div.* 1954); *Note,* 41 *Va. L. Rev.* 672 (1955).

■■ It has been suggested that the principle of *stare decisis* should stay our hand in expressly overruling *Glover,* even though a majority of the court is now firmly convinced that it embodied a mistaken interpretation of the Unemployment Compensation Law. To the extent that the principle of *stare decisis* affords a measure of stability it is of great social value. But as we pointed out in *Arrow Builders Supply Corp. v. Hudson Terrace Apts., Inc.,* 15 *N. J.* 418, 426 (1954), rehearing denied 16 *N. J.* 47 (1954), the principle is not an absolute one and under cogent circumstances it must give way to the overriding force which dictates that, since the purpose of our legal system is to serve justly the needs of present day society, judges must always remain free to re-examine earlier determinations and correct judicial errors whether they be their own or those of their predecessors. Where, as here, a court is called upon to construe a statute, its function is to seek and carry out the Legislature's purpose as fairly expressed in its language. As the Legislature itself has indicated by its passage of *L.* 1956, *c.* 65, and as we at this time recognize, the decision in *Glover* failed to carry out the legislative purpose, and we know of no sound reason why we should now adhere to its holding. In *Asbury Park Press v. City of Asbury Park,* 19 *N. J.* 183 (1955), this court, in an opinion by Justice Burling, recently overruled the statutory interpretation by

the Court of Errors and Appeals in *Whirl-O-Ball, Inc., v. City of Asbury Park,* 136 *N. J. L.* 316 (*E. & A.* 1947), and other instances involving the discarding of earlier statutory interpretations are collected in the *Arrow Builders* case (15 *N. J.,* at *page* 426). See *Stoffer, "The Supreme Court and Stare Decisis,"* 9 *Rutgers L. Rev.* 1 (1954). The legislative and judicial rejection of *Glover* have come so quickly that there has been no real opportunity for the type of reliance which is generally urged as the most persuasive basis, apart from its inherent soundness, for perpetuating a judicial decision. See *Frank, Courts on Trial,* 262–289 (1949).

Reversed.

*For reversal*—Justices WACHENFELD, BURLING, JACOBS and WEINTRAUB—4.

*For affirmance*—Justices HEHER and OLIPHANT—2.