Clara **HUEY** et al., Appellants,

v.

**TEXAS EMPLOYMENT COMMISSION** et al., Appellees.

No. 15658.

Court of Civil Appeals of Texas.

Dallas.

Dec. 4, 1959.

Rehearing Denied Feb. 19, 1960.

Mullinax, Wells & Morris, Charles J. Morris and Albert Levy, Dallas, for appellants.

Will Wilson, Atty. Gen., and C. K. Richards, Asst. Atty. Gen., for appellees.

DIXON, Chief Justice.

Appellant Clara Huey and twenty-six others, employees of appellee Nardis Sportswear, brought suit pursuant to Art. 5221b, Secs. 4(h) and (i) Vernon's Ann. Civ.St. for review of a decision of appellee

Texas Employment Commission denying appellants' claims for unemployment compensation. This is an appeal from a judgment of a District Court upholding the decision of Texas Employment Commission.

During the period May 21, 1956 through June 4, 1956 Nardis Sportswear shut down a substantial portion of its operations. Employees who had earned a two weeks' paid vacation in accordance with the terms of a collective bargaining contract, also employees who had earned a one week's paid vacation, were told to take their vacations during the shutdown period. Some of the employees in a few departments who had not earned any paid vacation were furnished work during the shutdown. Other employees, including these appellants, who had not worked long enough to be entitled to paid vacations were laid off during the shutdown. They applied for unemployment compensation for the period of time they were laid off without vacation pay during the shutdown. Their claims were denied.

Texas Employment Commission and the trial court held that appellants, under the terms of the collective bargaining contract negotiated through a labor union acting as their representative, had agreed to a vacation shutdown, consequently they had left their work voluntarily without good cause connected with their work, and were therefore disqualified for benefits under Art. 5221b–3(a) V.A.C.S.

### Facts.

The facts are undisputed, having been agreed to by the parties and set out at length in a written stipulation. We shall hereinafter quote from or state the substance of the more important parts of the stipulations.

Since 1941 International Ladies Garment Workers Union has been the collective bargaining agent for all of Nardis Sportswear employees. During the intervening period of time the Union and Nardis have been parties to collective bargaining contracts relating to the wages and working conditions of all said employees.

On or about March 14, 1955, Nardis and the Union entered into a revised collective bargaining contract which sets up a vacation plan as follows:

"A. The object of establishing the Vacation Plan hereinafter set forth is to provide the workers with diversion and rest from steady continuity of work and to contribute to their health and welfare.

"B. It is the desire and intention of the parties that eligible employees receive and enjoy annually the benefits of paid vacations. Employees are therefore expected not to accept other employment during such vacation periods, otherwise the actual purpose of this vacation plan will be defeated. Acceptance by an employee of work elsewhere during a vacation shall terminate his or her employment status with the Employer at the discretion of the Employer.

"C. The Employer agrees to grant one (1) week's annual vacation with pay, * * * to all workers who as of May 1st, of any calendar year during which this agreement is in effect have at least one (1) year's service with the Employer immediately prior to such date; and, two (2) weeks' vacation with pay * * * to all workers who as of the same date have at least five (5) years' service with the Employer.

"D. The vacation period shall be determined by the Employer at times between May 1st and June 30th of each year."

The production facilities of Nardis, though carried on in one building, are divided into two factories. The employees in the third floor factory, numbering approximately one hundred twenty (120), work largely on dresses and suits. The employees in the second floor factory, num-

bering approximately one hundred forty (140), work largely on skirts and blouses. Of the employees on the first floor approximately fifty (50) are engaged in finishing and pressing garments produced on the second and third floor factories; approximately fifteen (15) work as cutters, approximately sixteen (16) work in the belt department, and approximately fifteen (15) in the bundling department.

Since 1946 it has been the practice for Nardis to shut down substantial parts of its operations between seasons; that is, when there are no more orders to fill for summer garments the shutdown occurs. When operations resume they are on new production devoted to the manufacture of fall garments. The time for this shutdown varies. It has been as early as April and as late as June. It has usually been in May.

In 1956 approximately two weeks before the vacations were taken, Nardis notified the employees that the factories would be closed from May 21, 1956, through June 4, 1956.

During the period above named Nardis substantially ceased all production operations on its second floor factory. During the same period operations were substantially reduced in its third floor factory. Employees working in the third floor factory who were not entitled to paid vacations under the contract were generally given work during this period of time. But in the second floor factory no work was available and with a few exceptions none of the second floor employees worked during the vacation period.

Most of the first floor employees continued to work during the period May 21, 1956, through June 4, 1956, for the reason that their operations were finishing operations and work was available for them. Thereafter the first floor employees who were entitled to paid vacations under the contract received a vacation on a staggered basis with various employees taking their vacations at different periods of time. Such vacations were taken to coincide with the employer's production schedule so that non-vacationing employees would be available to perform the necessary finishing work as the garments came down from the second and third floors for completion.

We quote again from the stipulation:

"15."

"It has traditionally been the practice of Nardis to employ its employees when work, i. e., orders for finished merchandise, is available. At such times as when work has been short or unavailable it has been necessary to lay off its employees. None of the employees are guaranteed any set number of hours per week or any set amount of work or hours during the years, and some times the factory has been shut down for lack of work when such shutdowns have not coincided with the period when vacations were taken.

"16.

"Throughout the years that vacations have been given the union has never agreed that the vacations should be by plant shutdown. The decisions substantially to shut down the factory during the time when vacations are given has always been the employer's decision in accordance with the terms of the contract.

"17.

"Although the union at all times material hereto was the collective bargaining representative for all of the production employees, some of the employees were not members of the union, including some of the employees who received no vacation pay because of insufficient seniority and those who received one week's vacation pay only because of insufficient seniority. It is agreed, however, that most of the employees were members of the union.

"18.

"At no time did any of the plaintiffs request or authorize the union to agree that they or any of them or any employee similarly situated was to receive a vacation without pay whether for a period of one week, two weeks or any other period of time, and the union did not at any time request or agree with Nardis that any such employees was to be given unpaid vacations for any period of time, except to the extent, if any, that they were bound by the contract between the union and the employer of which all employees had notice.

"19.

"Neither management nor the union objected to employees who received no vacation pay from seeking and obtaining other employment during the shutdown when other employees were on vacation and receiving vacation pay, or employees who received only one week's vacation from seeking and obtaining other employment for the remaining time they were out of work during the aforesaid period when the plant operations were shut down or curtailed."

Each of appellants during the times material to this controversy was able to work and was available for work either at Nardis or elsewhere.

Opinion.

Since the facts are undisputed we are faced only with a question of law. Appellants have briefed four points on appeal, but we believe that all their points may be encompassed in this one question:

When a plant shutdown occurs under the circumstances shown in this case, and employees eligible for paid vacations under the terms of a collective bargaining contract are required to take their vacations during the period of the shutdown, is it error to hold that union employees who are laid off during the shutdown but are not eligible for paid vacations are disqualified under Art. 5221b–3(a) V.A.C.S. from receiving unemployment benefits during the shutdown because, under the terms of the collective bargaining contract, they may be said to have agreed to a vacation shutdown, so must be held to have left their last work voluntarily without good cause connected with their work?

So far as we know the question is a matter of first impression before the courts of Texas.

The question has been passed on in other States with varying results and conflicts. See Annotations in 30 A.L.R.2d 366, and Supplemental Annotations.

Among the cases from other jurisdictions cited by appellants in support of their contentions that they are entitled to unemployment compensation are these: Schettino v. Adm'r, Unemployment Compensation Act, 1951, 138 Conn. 253, 83 A. 2d 217; Golubski v. Unemployment Compensation Board of Review, 1952, 171 Pa. Super. 634, 91 A.2d 315, 30 A.L.R.2d 362; American Bridge Co. v. Review Board of Indiana Employment Security Division, 1951, 121 Ind.App. 576, 98 N.E.2d 193; Thornbrough v. Schlenker, 1958, 228 Ark. 1012, 311 S.W.2d 753; Watson v. United States Rubber Co., 1957, 24 N.J. 598, 133 A.2d 328; and Teichler v. Curtiss-Wright Corp., 1957, 24 N.J. 585, 133 A.2d 320.

Appellants also point out that in four jurisdictions, Washington, Massachusetts, Pennsylvania and New Jersey, statutory enactments have nullified the holdings in cases relied upon by appellees. Moreover in the Watson case the Supreme Court of New Jersey overruled its earlier holding in Glover v. Simmons Co., 17 N.J. 313, 111 A.2d 404, relied on by appellees, though the factual controversy arose before the effective date of the legislative amendment.

Among the cases cited by appellees in support of their contentions that appellants

are not entitled to unemployment benefits are these: In re Buffelen Lumber & Mfg. Co., 1948, 32 Wash.2d 205, 201 P.2d 194; Moen v. Director of Division of Employment Security, 1949, 324 Mass. 246, 85 N.E. 2d 779, 8 A.L.R.2d 429; Mattey v. Unemployment Compensation Board of Review, 1949, 164 Pa.Super. 36, 63 A.2d 429; and Glover v. Simmons Co., 1955, 17 N.J. 313, 111 A.2d 404. However in each of the above jurisdictions, that is, in Washington, Massachusetts, Pennsylvania, and New Jersey, the rule laid down by the cited cases was later abrogated by statutory enactment. Appellees say that the Texas Statute has not been similarly amended, therefore the reasoning of the cited cases should govern our holding here.

Among other cases cited by appellees are I. M. Dach Underwear Co. v. Michigan Employment Security Commission, 1956, 347 Mich. 465, 80 N.W.2d 193; Beaman v. Bench, 1953, 75 Ariz. 345, 256 P.2d 721; In re Southern, 1958, 247 N.C. 544, 101 S.E. 2d 327; Jackson v. Minneapolis-Honeywell Regulator Co., 1951, 234 Minn. 52, 47 N.W.2d 449; In re Chichipas' Claim, 1957, 3 A.D.2d 880, 161 N.Y.S.2d 362; Adams v. Review Board of Indiana Employment Security Division, 1957, 237 Ind. 63, 143 N.E.2d 564; and Philco Corp. v. Unemployment Compensation Board of Review, 1954, 175 Pa.Super. 402, 105 A.2d 176.

To discuss all of the cited cases would be to prolong this opinion beyond reason. We shall merely discuss a few of them to illustrate why we have concluded that most, though not all, of the seeming conflicts may be distinguished on the basis of variation in particular fact situations, in statutory provisions, and in collective bargaining contract.

For instance in the Schettino case, relied on by appellants, the court distinguished such cases as the Moen, Jackson and Mattey cases as having arisen under statutes which disqualified employees who "voluntarily left [their] employment", whereas the disqualification in the Schettino case was confined by the Connecticut Statute to employees who "voluntarily left [their] employment] *without sufficient cause relating to [their] employment."* [138 Conn. 253, 83 A.2d 219.] (Emphasis supplied.)

In the Jackson case and the Adams case, relied on by appellees, the collective bargaining contract expressly provided that "all employees" should take time off for the vacation period.

In the Philco, Mattey, Adams and Dach cases, also relied on by appellees, the collective bargaining contract provided that there should be a vacation shutdown, whereas in the Teichler case relied on by appellants, the contract contains no provisions for a plant shutdown; and in the Golubski case the contract expressly stipulated that those who were not entitled to any paid vacations were "to be on lay-off status". [171 Pa.Super. 634, 91 A.2d 316.]

In Pennsylvania different results were reached in the Mattey case and the Golubski case even before the Pennsylvania Legislature amended the law so as to change the rule announced in the Mattey case. In reaching a different result in the Golubski case the Court distinguished the factual situation from that in the Mattey case.

In some contracts the matter of vacation shutdowns was optional with the employers, in others the contract was silent on the question. These and other distinctions are discussed in the Schettino, Teichler, Golubski cases and in the dissenting opinion in the Dach case.

We turn now to the facts and the statutes in the instant case.

The disqualifying Statute relied on by appellees is Art. 5221b–3(a). It is as follows: "An individual shall be disqualified for benefits: (a) If the Commission finds that he has left his last work voluntarily without good cause connected with his work." In this case the Commission did find that appellants had left their employment voluntarily without good cause con-

nected with their work. But the facts are undisputed, having been agreed to in a written stipulation of facts, consequently the question becomes a matter of law subject to review by the courts.

In our opinion Art. 5221b–13(a) V.A. C.S. must be kept in mind in reaching a conclusion in this case. It is as follows: "No agreement by an individual to waive, release, or commute his rights to benefits or *any other rights* under this Act, shall be valid." (Emphasis supplied.)

In Meggs v. Texas Unemployment Compensation Commission, 234 S.W.2d 453 the Fort Worth Court of Civil Appeals held that a particular claimant was not entitled to unemployment compensation because her reason for leaving was not connected with her former employment, but held also, and we agree, that the Texas Unemployment Law is remedial in nature and should be construed liberally to give effect to its beneficent purposes. The latter holding finds support in other jurisdictions. Tennessee Coal, Iron & R. Co. v. Martin, 1948, 33 Ala.App. 502, 36 So.2d 535; Nordling v. Ford Motor Co., 1950, 231 Minn. 68, 42 N.W.2d 576, 28 A.L.R.2d 272; Puget Sound Bridge & Dredging Co. v. State Unemployment Compensation Comm., 1942, 168 Or. 614, 126 P.2d 37. The Tennessee Coal Iron case and the Nordling cases above cited go further and hold that disqualifying clauses should be strictly construed, as does Crouch v. Murphy, 390 Ill. 112, 60 N.E.2d 879.

Appellees argue that Art. 5221b–13(a) is inapplicable herein, and in support of their argument cite us to the Dach and the Jackson cases. In the Dach case, in construing a similar Statute, the court said, "There may not be a waiver as to a right that does not exist." [347 Mich. 465, 80 N.W.2d 201.] We agree with the statement itself, but we cannot see its applicability here. The very purpose of this inquiry is to determine whether each of these individual appellants·has a right to unemployment compensation during the

plant shutdown. If she does have such a right then under the Statute her individual agreement to waive that right is not valid. And if she could not make such a binding agreement herself, she could not make it through a person or organization acting as her agent.

In the Jackson case the court, also construing a similar Statute, said: "The agreement is not one to waive rights to benefits which an employee otherwise would be entitled to, but an agreement for a two weeks' vacation leave or voluntary absence from work." [234 Minn. 52, 47 N.W.2d 454.] We find ourselves unable to accept the reasoning of the court in the above quotation as being applicable to these appellants. We cannot bring ourselves to believe that the employers were bestowing a benefit on appellants by requiring them to remain away from their work for two weeks without pay, whether we call their absence from work a layoff or a vacation without pay. Our view seems to us to find support in the agreed facts as shown in Paragraph 18 of the written stipulation. "At no time did any of the plaintiffs request or authorize the union to agree that they or any of them or any employees similarly situated was to receive a vacation without pay whether for a period of one week, two weeks, or any other period of time, * * *." It is to be remembered, too, that it is an agreed fact that each of these appellants during the period of time material to this controversy was able to work and was available for work at Nardis or elsewhere.

We think it is also significant that under the terms of the collective bargaining contract employees entitled to a paid vacation are forbidden to accept other employment during the vacation period. But in Paragraph 19 of the stipulated facts the parties agree that neither management nor the union objected to employees seeking and obtaining other employment if they were not eligible for a paid vacation. This seems to us to be a recognition that these appellants and those similarly situated were

considered to be in a different category from employees who had agreed to a vacation layoff.

The collective bargaining contract in this case does not provide that *all employees* shall take a vacation, as in the Jackson case cited by appellees. We find nothing in the contract whereby employees not eligible for a paid vacation are entitled to any vacation at all. Quite to the contrary the fact is that it was the practice of Nardis to continue to work employees not entitled to a vacation if there was work available for them during the shutdown.

Whether employees not entitled to a paid vacation are to be laid off or kept on the job is altogether optional with Nardis, the employers. And whether there should be a plant shutdown is also altogether optional with the employers.

It should be pointed out also that the shutdown in this case was not solely for the purpose of allowing employees entitled to paid vacations to take their vacations simultaneously. It was a practice of Nardis to close down between seasons to enable the plant to be changed from the production of summer merchandise to fall merchandise. In this particular the fact situation is not unlike that in the American Bridge Company and the Golubski cases where the shutdowns were partly for the purpose of taking inventory, and the Schettino case where the shutdown was partly for the purpose of performing construction work.

Considering the undisputed facts of this case and considering also the interpretation to be given Art. 5221b, V.A.C.S. as a whole and to Sections 3(a) and 13(a) in particular, we are of the opinion that these appellants, notwithstanding the collective bargaining contract in question, cannot be said to have left their last work voluntarily without good cause connected with their work. Consequently they are not disqualified under Art. 5221b–3(a), V.A.C.S. from receiving unemployment compensation during the time they were unemployed without pay during the plant's vacation shutdown.

Of course to be eligible for unemployment compensation appellants must qualify under the terms of eligibility as set out in other sections of Art. 5221b, V.A.C.S.

Appellants' four points on appeal are sustained.

The judgment of the trial court is reversed and judgment is here rendered directing Texas Employment Commission to grant appellants' claims provided appellants meet the requirements for unemployment compensation as set out in other Sections of Art. 5221b, V.A.C.S.

Reversed and rendered.